UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-8274
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                        versus

JOHNNY CARL MICHELLETTI,

                                        Defendant-Appellant.


_____

            Appeal from the United States District Court
                 for the Western District of Texas
_____
                        January 25, 1994


Before POLITZ, Chief Judge, REYNALDO G. GARZA, KING, GARWOOD,
JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE,
EMILIO M. GARZA, and DeMOSS, Circuit Judges.[*]

EDITH H. JONES, Circuit Judge:

        The court has decided again to turn its attention en banc
to the extent of a police officer's authority to conduct a Terry
frisk for officer and public safety.  In United States v. Rideau,
969 F.2d 1572 (5th Cir. 1992) (en banc), we held that an officer
did not violate the Fourth Amendment when he "reached out and
touched the pants pocket" of "a person he suspected was
intoxicated, standing in the road, at night, in a high crime area."
Id. at 1573.  Here, we hold that the Fourth Amendment is not

_____

        [*]      Senior Circuit Judge Jerre S. Williams, who wrote a dissent to the
panel opinion in this case, died before opinions were circulated in this case.

violated when an officer lightly frisked the pants pocket in which the appellant held his right hand as he barged out the back door of a bar, beer in the left hand, at closing time, and walked toward the policeman and a group of individuals he was about to question. Our decision rests squarely upon the reasonableness of the officer's decision as gauged in Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884-85 (1968):

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

## BACKGROUND

In the early morning hours of November 17, 1991, El Paso police officers George Perry and Saul Medrano were on routine motor patrol in a high crime area. Just after 2:00 a.m., Officer Perry observed a man walking in front of Alacran's Lounge who, when he saw the patrol car, turned and ran behind the bar. The officers decided to investigate. As their car drove up behind the bar, Officer Perry saw three men standing under a spotlight, one of whom was the man he had originally observed.

2

While stepping out of the car, Perry immediately scanned the subjects' hands for weapons and saw none. Suddenly, another man noisily pushed open the rear exit door from the bar and began to approach Perry and the suspects,[1] holding an open beer can in his left hand while keeping his right hand in his pants pocket. This was Johnny Carl Michelletti. Perry testified:

> I noticed two things in particular that caught my attention. First of all, being left-handed myself, I noticed that he had his right hand in his front pocket. To me most people are right-handed and that seems strange because in his left hand he had a beer and he was drinking the beer as he was leaving the establishment.

Later, Perry continued:

> And his whole attitude, although he was calm, he seemed a little bit almost cocky. But he looked at me, we made eye contact, but then he looked away and acted as though I was not there and tried to walk on by. And that caught my attention as well.

To Officer Perry, the placement of Michelletti's hands and his demeanor were highly significant. Further, the door that Michelletti opened stood less than ten yards away from Perry, within easy range for an attack. Michelletti was over six feet tall and weighed 220 pounds. In Perry's experience, there is a greater probability that violence will erupt outside a bar at closing time.

---

[1] The dissent suggests that we have mischaracterized the record in asserting that Michelletti walked <u>toward</u> Officer Perry and the other suspects. Officer Perry testified Michelletti "tried to walk on by." Appellant's brief says, Michelletti "began to walk past [Perry]." It is a fair inference that Michelletti had to approach Perry in order to walk right on by.

Officer Perry told Michelletti he was going to frisk him for weapons, and he had Michelletti place the beer and his hands on the patrol car while Perry checked Michelletti's pockets.  A quick frisk uncovered a .22 caliber pistol in the right hand pants pocket where Michelletti's hand had been hidden only seconds earlier.

Michelletti pled guilty to the unlawful possession of a firearm by a convicted felon.  18 U.S.C. § 922(g)(1) (1988).  He had previously been convicted of aggravated assault of a police officer in 1989.  Michelletti reserved the right to appeal the denial of his motion to suppress evidence of the pistol.  He was sentenced to 33 months imprisonment, three years supervised release and a $50 assessment.  This appeal followed.

### DISCUSSION

The pertinent law, which originates in Terry v. Ohio, supra, is undisputed.  Police officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot.  The Fourth Amendment requires only some minimum level of objective justification for the officers' actions -- but more than a hunch -- measured in light of the totality of the circumstances.  See, e.g., United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989); United States v. Sanders, 994 F.2d 200, 203 (5th Cir. 1993); United States v. Rideau, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc).  Reasonable suspicion must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably

4

warrant an intrusion.  See United States v. Galberth, 846 F.2d 983, 989 (5th Cir.), cert. denied, 488 U.S. 865 (1988) (citing Terry, 392 U.S. at 19, 88 S. Ct. at 1878-79).

Equally important for Fourth Amendment purposes, "the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." Adams v. Williams, 407 U.S. 143, 147, 92 S. Ct. 1921, 1923 (1972).  Terry acknowledged the legitimacy of a policeman's interest in "taking steps to assure himself that a person with whom he is dealing is not armed" and dangerous, and it emphasized this concern by citing the increasing number of murders and assaults being perpetrated on law enforcement officers.  Terry, 392 U.S. at 23, n.21, 88 S. Ct. at 1881, n.21.[2]  Terry concludes its balancing of the suspect's liberty interest and the public safety interest by countenancing "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual. . . ."  Id. at 24, 88 S. Ct. at 1881.  An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on "specific and articulable facts," that his safety or that of others is in danger.  Id. at 27, 88 S. Ct. at 1883.  In assessing

---

[2]    Terry cites FBI statistics to show that in 1966, 57 law enforcement officers were killed in the line of duty, bringing the total to 335 for the seven-year period beginning with 1960.  Also, in 1966, there were 23,851 assaults on policemen, 9,113 of which caused injuries.  Terry, 392 U.S. at 23, n.21, 88 S. Ct. at 1881, n. 21.

reasonableness, "due weight" must be given to the facts and inferences viewed "in light of [the officer's] experience." Id.

This court reviews the reasonableness of an investigatory stop and frisk de novo as a conclusion of law. See United States v. Basey, 816 F.2d 980, 988 (5th Cir. 1987). However, the appellate court must review the evidence in the light most favorable to the government as the prevailing party. See United States v. Simmons, 918 F.2d 476, 479 (5th Cir. 1990). Also, this court "should uphold the district court's ruling to deny the suppression motion 'if there is any reasonable view of the evidence to support it.'" United States v. Register, 931 F.2d 308, 312 (5th Cir. 1991) (quoting United States v. Montos, 421 F.2d 215, 219 n.1 (5th Cir.), cert. denied, 397 U.S. 1022, 90 S. Ct. 1262 (1970)).

There should be no question that the police officer articulated a reasonable basis to investigate the group of patrons standing outside the rear of Alacran's Lounge. This issue was not really disputed in the district court. The man who had just turned and run evasively at the mere sight of a patrol car had joined two others. The police could not know what these actions might mean, but they were entitled to find out. Instantaneously upon their arrival, Michelletti noisily emerged from the bar, beer in hand, and approached the entire group.

Two aspects of Michelletti's behavior led Officer Perry to investigate him while Medrano dealt with the other men. First, Officer Perry believed he should investigate Michelletti for

6

possible alcoholic beverage offenses[3] arising under regulations of the Texas Alcoholic Beverage Commission. Tex. Alco. Bev. Code § 101.07 (West 1978).[4] Officer Perry considered it a violation for Michelletti to be drinking a beer as he was leaving the bar. See id. § 101.72(a) (West 1993).[5] He knew that a bar patron violates the law by consuming liquor served after lawful closing hours. See id. § 105.06 (West 1978).[6] Other TABC violations might also have come into play, even though the state regulatory scheme generally governs the purveyors of alcoholic beverages rather than the buyers. See, e.g., id. at § 28.10(b) (West 1978) (prohibiting a mixed beverage permittee from allowing a patron to take a beverage off the premises); § 32.15 (West 1993) (barring the removal of alcoholic beverages from the premises of a private club); § 71.03

---

[3] The Texas Court of Appeals, reviewing Michelletti's conviction for parole violation, did not question Officer Medrano's testimony that Michelletti was in violation of the Texas Alcoholic Beverage Code, although it appears this was a civil rather than criminal violation. Michelletti v. State of Texas, Case No. 08-92-0075-CR, Eighth Court of Appeals, El Paso, Texas (unpublished). The state court did, however, refuse to affirm Michelletti's conviction because it did not believe the police officers articulated sufficient facts to justify the Terry frisk. We do not have the testimony adduced in state court and cannot say how that record differs from the one before us.

[4] **§ 101.07. Duty of Peace Officers**

All peace officers in the state, including those of cities, counties, and state, shall enforce the provisions of this code and cooperate with and assist the commission in detecting violations and apprehending offenders.

[5] **§ 101.72. Consumption of Alcoholic Beverage on Premises Licensed for Off-Premises Consumption**

(a) A person commits an offense if the person knowingly consumes liquor or beer on the premises of a holder of a wine and beer retailer's off-premise permit or a retail dealer's off-premise license.

[6] No violation actually occurs until after 2:15 a.m.

7

(forbidding an off-premise licensee from selling beer to be opened or consumed on or near the premises); § 105.05(c) (West 1978) (prohibiting an on-premise purveyor from selling beer after 2:00 a.m.).[7] Ramon Valles, a friend of Michelletti and manager of Alacran's Lounge, testified as a witness for the defense:

> A. Nobody can walk with beers outside, we cannot sell beer [after 2:00 a.m.]. What else would you like to know on this?
>
> Q. He couldn't, if he had bought a beer in there --
>
> A. He couldn't walk with it outside, no.
>
> Q. He could not enter?
>
> A. No sir.

Valles went on to say that the lounge could be fined or could lose its license for such violations, but this does not detract from his understanding that Michelletti could not violate TABC regulations.

Second, Perry's suspicions were aroused not only by the open container of alcohol, but by Michelletti's purposeful strides toward the group that Perry had just encountered behind the lounge. On this basis alone, Perry's suspicion was no less reasonable than that which the Supreme Court approved in Terry. In Terry, the police officer had observed two men simply walking back and forth in front of a store in broad daylight for ten or twenty minutes. Although the men had actually turned and walked away from the store

___

[7] Even Judge Williams, dissenting from the panel opinion, conceded that Officer Perry may have possessed a good faith, though Judge Williams believed inaccurate, belief that Michelletti had violated TABC regulations, and a "brief stop of Michelletti could therefore be justified. . . ." United States v. Michelletti, 991 F.2d 183, 187 (5th Cir. 1993) (Williams, J., dissenting).

8

when the officer detained them, the Supreme Court approved the detention and frisk, relying heavily on the police officer's seasoned judgment of what the occasion demanded. Terry, 392 U.S. at 22-23, 88 S. Ct. at 1880-81.

Applying the Terry standard to Officer Perry, an experienced patrolman, one must conclude that the possibility that alcoholic and deliberate approach, in the context of the suspicious circumstances under which the police encountered the group behind Alacran's Lounge, constituted a reasonable basis to investigate Michelletti further.

The next question is whether Officer Perry's decision to frisk Michelletti by placing him against the patrol car with his hands resting on it was justified by specific and articulable facts. We conclude, as we did in Rideau, that "[a] reasonably prudent man in [Officer Perry's] situation could have believed that his safety and that of [others] was in danger." Rideau, 969 F.2d at 1574. Michelletti, a large and imposing man, was heading straight toward him with a "cocky," perhaps defiant attitude and his right hand concealed precisely where a weapon could be located. That Officer Perry took special note of the location of Michelletti's right hand is a fact whose importance cannot be overstated. The policeman had scanned all of the subjects', hands as he alighted from his car when it pulled up behind Alacran's Lounge. As a left-hander himself, Officer Perry said, he is accustomed to notice how most people, i.e., right-handers, place their dominant hands. It is also significant that Michelletti had

9

a beer in one hand and the other hand in his pocket when he opened the door; in that situation, the hand would ordinarily come out of the pocket. That it did not was suspicious. Officer Perry's suspicion was aroused reasonably by the potentially dangerous location of Michelletti's right hand.

At the suppression hearing, Officer Perry testified, under clever cross-examination, that, before the patdown, he had no specific reason to believe Michelletti was armed. This statement somewhat detracts from our position but does not prove that Officer Perry had no reason to be concerned about Michelletti. In United States v. Tharpe, 536 F.2d 1098 (5th Cir. 1976), (en banc), we upheld a patdown even though "the officer . . . did not explicitly testify that he feared he was in danger because Tharpe might be armed" (id. at 1099), and observed:

> "If the officer had an objective factual basis for then thinking there was a real risk to his own safety, his later verbalization of his thoughts or feelings can hardly be dispositive of the on-the-scene reasonableness of conducting a protective search for weapons.
>
> . . .
>
> His subjective feelings may have been equivocally expressed, but his testimony clearly shows that he felt a risk of danger, and had a subjective awareness of facts justifying such an apprehension." Id. at 1100.

We rely on such facts here, as did the district court.

Other circumstances surrounding the encounter signaled a need for caution. First, it was closing time at a bar, a late hour when the presumably well-lubricated habitués would begin heading

10

for home -- or for trouble.  The officers were well aware of a higher likelihood of angry confrontations at closing time.  Second, the officers did not know whether they were confronting one suspect, two suspects, or all four of the men outside the bar as suspects in criminal activity.  The size of the group added to the calculation of danger for the police and for any of the group's innocent members.  Thus, even if the likelihood of Michelletti's being armed was somewhat less tangible, the amount of damage he could inflict if armed was much larger gauged by the number of onlookers.  Third, the police could not dispel the possibility that Michelletti himself was either inebriated or less in control of his faculties because he had been drinking so late at night.

Given both a reasonable basis to perceive that illegal activity might be underway, and that there was a possibility of danger as he conducted an investigation, Officer Perry faced only one more decision:  the extent to which he would physically intrude on Michelletti.  He did not pull his gun.  He did not handcuff Michelletti.  He did not perform a full body frisk.  He merely asked Michelletti to place his hands on the patrol car, and he scanned Michelletti's pants pockets lightly, a move that quickly revealed the pistol.  Michelletti was not subjected to a "shakedown."  Rideau, 969 F.2d at 1576.  Instead, the physical intrusion was similar to that in Rideau:

> Reaching out to touch Rideau's pocket was a limited and tailored response to Ellison's fears for his safety, and served to validate his concerns.  Its very spontaneity equally validates the objective reasonableness of the practical balance of safety and liberty.  This

11

was not the intrusive exploration of a detainee's body that the Court envisioned in Terry. (footnote omitted).

Id. at 1575.

In a case with striking parallels to this one, a panel of this court recently approved a particularly intrusive detention under Terry. United States v. Sanders, 994 F.2d 200 (5th Cir. 1993). Defendant Sanders had been identified by a convenience store owner as carrying a gun while he was in the store. See id. at 201. Whether the store owner had actually seen the weapon or merely suspected its presence is not clear. The officer on mid-day patrol responded to a radio dispatch describing this event and arrived in front of the store, tentatively identifying Sanders from his clothing as he stood among a group of people outside the store. See id. at 202. The policeman noted that Sanders' jacket could conceal a firearm, and the brown bag Sanders carried could suggest the presence of an alcoholic beverage or another weapon. See id. at 207. Sanders turned and started to walk away as the squad car approached. Such an action, the opinion states, "can be used by a criminal to prepare for violent confrontation. . . ." Id. The officer was also conscious of the safety of other people standing nearby, including children. See id.

Sanders' description of the considerations that faced the police officer there apply readily to this case:

> When Officer Hambrick arrived on the scene at Cruz's Grocery, he had only a matter of seconds to assess the situation, formulate a plan of action, and implement it. In so doing, he had to balance several competing priorities: to investigate the alleged crime

12

> and make any appropriate arrests; to prevent
> the commission of any additional crime; not to
> infringe on the rights of [the defendant] or
> any other persons who might be affected by the
> officer's actions or inactions; to ensure the
> safety of others of the general population
> present or nearby; and to go home in one piece
> at the end of his shift.

Id.

The panel concluded in Sanders that it was not unreasonable for Officer Hambrick immediately to draw his gun upon confronting Sanders, and, when Sanders ignored his command to lie down, to have him handcuffed before searching for weapons. Indeed, Sanders impressively amasses an array of caselaw permitting police officers to take stern and swift measures when necessary to "discover the true facts and neutralize the threat of harm if it materialized." Terry v. Ohio, 392 U.S. at 30, 88 S. Ct. at 1884. Sanders also points out:

> The fact that the protection of the public
> might, in the abstract, have been accomplished
> by "less intrusive" means does not, by itself
> render the search unreasonable. The question
> is not simply whether some other alternative
> was available, but whether the police acted
> unreasonably in failing to recognize it or
> pursue it.

Sanders, 994 F.2d at 204, (quoting United States v. Sharpe, 470 U.S. 675, 687, 105 S. Ct. 1568, 1576 (1985) (internal quotations and citations omitted)).

Each case involving the reasonableness of a Terry stop and frisk turns on its own facts. But it would be a bold fact-finder indeed who could review the facts available to Officer Hambrick in Sanders and the facts confronting Officer Perry in

13

Michelletti and conclude that Hambrick's weapon-drawn stop-and-handcuff actions were objectively reasonable while Perry's patdown was not.  A similar comparison between this case and Rideau not only presents no reason to differentiate the reasonableness of the police officers' actions in the two cases, but emphasizes Officer Perry's even greater obligation to defuse the risk to the physical safety of the entire group of men while he and his partner investigated.  As the Supreme Court put it:

> We cannot say his decision at that point to seize [the defendant] and pat his clothing for weapons was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment; the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so.

392 U.S. at 28, 88 S. Ct. at 1883.

Officer Perry expressed concern that he was patrolling a high crime area of town and that a friend and fellow officer had been mortally shot only two weeks earlier.[8]  His concern was neither irrational nor irrelevant.  The location in which suspicious behavior occurs, like the time of day, is among the facts that generate reasonable inferences as to the necessary police response to the behavior.[9]  A policeman's reaction to his or her geographic location is just as natural as the fact that we all secure our houses at night or check the locks on the car when

---

[8]     Our opinion rests not on these facts alone, but on the totality of the circumstances that confronted the policeman and influenced his judgment.

[9]     See Rideau, 969 F.2d at 1575.

14

traversing certain parts of town. Further, Officer Perry's concern for his safety, dramatized by the recent loss of his friend, is hardly groundless in this day and age. The number of police officers killed annually in the line of duty has tripled since _Terry_ was decided; the numbers of those assaulted and wounded have risen by a factor of twenty.[10] Surely the constitutional legitimacy of a brief patdown such as occurred here may and should reflect the horrendously more violent society in which we live, twenty-five years after _Terry_.

The conclusion of _Rideau_, paraphrased, applies fully to this case:

> We do not depart from the rule that police officers must have specific and articulable facts indicating that their safety is in danger to justify a patdown. Nor do we assert that a lawful detention is a license to frisk. We simply look to the reality that the setting in which the police officer acts may reasonably and significantly affect his decisional calculus. A reasonably prudent man in Officer [Perry's] position could believe that he was in danger as [Michelletti approached him, his partner, and the three other men]. The minimally intrusive action that he took to ensure his safety and that of [others] was not a violation of [Michelletti's] constitutional rights. The Fourth Amendment does not require police to allow a suspect to draw first.

_Rideau_, 969 F.2d at 1576.

AFFIRMED.

---

[10] According to the FBI, in 1989-90, an average of 153 law enforcement officers were killed annually in the line of duty; over 203,000 were wounded; over 586,000 were assaulted. _Washington Adds Monument Honoring Officers Who Died_, N.Y. Times, Oct. 20, 1991; _151 Law Enforcement Officers Killed in 1989_, PR Newswire, Dec. 29, 1989, _available in_ LEXIS, Nexis Library. Compare n.1, _supra_.

HAROLD R. DeMOSS, Circuit Judge, specially concurring:

I concur in the result reached by the majority opinion. This is a close case involving conflict between two very real and legitimate interests: (1) the interest of the citizen to be free from unreasonable searches and seizures, and (2) the interests of the police officer to be secure in his personal safety and to prevent harm to others. When those two interests come into conflict at 2 a.m. outside of a bar, I think common sense and prudence say that we give preference to the safety interest of the police officer. At that hour of the night, the overwhelming majority of law-abiding citizens are at home in bed. Michelletti was obviously not at home in bed, and the events of this encounter showed he was not law-abiding, for he was carrying a pistol in violation of the laws of the State of Texas. The dissent contends that Officer Perry had no reasonable ground to believe that Michelletti had a gun in his pocket, and that we therefore cannot let the fact that Michelletti was not a law-abiding citizen color our determination. But when Michelletti unexpectedly appeared on the scene, Officer Perry had only a matter of seconds to assess the significance of that turn of events, and I believe what struck Officer Perry as most significant was the fact that Michelletti had his right hand in his pocket. I doubt seriously that Officer Perry gave any consideration during those few seconds of time to the intricacies of the Texas Alcoholic Beverage Code, nor did he remember the death of a fellow officer in the line of duty. To that extent, some of the language in the majority opinion strikes

me simply as ex post facto rationalization.  But with the intuition born of experience, Officer Perry sensed danger, and the actions which Officer Perry took then were those most reasonable and appropriate to "neutralize the threat of physical harm" to himself, his fellow officer and the other individuals who were the subjects of their original investigation.  Just as in baseball, we give a tie to the runner, and in football, we give a simultaneous catch to the receiver, I think in this case the close call goes in favor of the reasonableness of Officer Perry's actions.

JERRY E. SMITH, Circuit Judge, with whom POLITZ, Chief Judge, KING, DUHÉ and WIENER, Circuit Judges, join dissenting:

Concluding that the majority has strayed from the dictates of the Supreme Court and from the recent pronouncements of this court sitting en banc, I respectfully dissent.  The majority, although purporting to rely upon Terry v. Ohio, 392 U.S. 1 (1968), fails to mention, much less to apply, the central requirement of that case: that the Constitution requires "individualized suspicion" and authorizes only "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on `specific and articulable facts,' . . . and not on a mere `inchoate and unparticularized suspicion or "hunch,"' . . . `that he is dealing with an armed and dangerous individual.' . . . ." Maryland v. Buie, 494 U.S. 325, 332, 334 n.2 (1990) (emphasis added) (quoting Terry, 392 U.S. at 21, 27).  In no respect does the record

in this case support the conclusion that Officer Perry had reason to think defendant Michelletti was both "armed and dangerous."

## I.

First, I take issue with the facts set forth by the district court in its factual findings and by the majority in its opinion. In its written order, the district court made only truncated findings regarding the question of Michelletti's dangerousness:

> 6. Officer Perry observed the defendant exiting the rear door of the bar with a container of beer in his left hand, and his right hand in his pocket.

> 7. Officer Perry testified that his experience as a police officer has proven confrontations between patrons and police officers are likely to occur during closing time at bars. Further, he feared for the safety of himself and his partner, and determined a search of the defendant for weapons was justified. He testified he was being extremely careful, since a fellow officer had recently been shot.

There is no evidence that in regard to anything Michelletti did or said, Perry "feared for the safety of himself and his partner." The testimony is to the contrary. Asked whether "anybody [did] anything threatening toward you or your partner," Perry replied, "I wouldn't say anybody did anything threatening, no, sir." When asked whether "[t]he fact that he had his right hand in his pocket and according to you a beer in his left, that was a suggestion to you that he was armed and threatening?," Perry answered, "No, sir, that was not a suggestion that he was armed." Perry later added, "No, he had not done any overt actions at that time."

Accordingly, the district court clearly erred in stating that Perry was in fear at the time he ordered Michelletti to undergo a search. Without that factual predicate, <u>Terry</u> and <u>Buie</u> cannot be satisfied, for the district court is left only with the findings that Michelletti exited the bar with a beer in one hand and the other hand in his pocket and that Perry was generally aware that confrontations occur with some regularity outside bars at closing time. Nothing about these facts provides the "individualized suspicion," <u>Buie</u>, 494 U.S. at 334 n.2, that the law requires to show that Michelletti was "armed and dangerous."

Nor does the majority report the facts with sufficient reliability. Perry testified that Michelletti came "straight out of the bar." There is no indication that when he exited the bar, Michelletti "walked toward the policeman and a group of individuals he was about to question." Majority op. at 2. This casts a shadow on the majority's assertions that "Michelletti noisily emerged from the bar, beer in hand, and approached the entire group," <u>id.</u> at 6, that Michelletti made "purposeful strides toward the group that Perry had just encountered behind the lounge," <u>id.</u> at 8, that Michelletti made an "alcoholic and deliberate approach," <u>id.</u> at 9, and that "Michelletti . . . was heading straight toward him . . . ," <u>id.</u>

The fact is that, assuming <u>arguendo</u> that Perry had reason to think Michelletti was doing something suspicious, nothing in the record supports the conclusion that he posed a threat to anyone. So, the most that was called for was a momentary stop for

questioning, not a search for weapons.  That is the only possible justification for the search in question, a <u>Terry</u> search for weapons for the sole purpose of protecting those persons on the scene.

The testimony at the suppression hearing provides no suggestion that Michelletti was acting in concert with the three suspects the officers were observing outside the bar.  All Michelletti did was to exit a bar at closing time.  Although the majority tries to make much of potential violations of state liquor laws, the government now has conceded that Michelletti was guilty of no liquor law infraction.  Yet, he was subjected to a patdown for leaving the bar with a beer in one hand and the other hand in his pocket.

II.

The scope of the search conducted on Michelletti is questionable.  Recently in <u>United States v. Rideau</u>, 969 F.2d 1572 (5th Cir. 1992) (en banc), this court described the limits of permissible police street encounters.  There, the majority opined that "[t]he scope of [the officer's] `frisk' of Rideau is a relevant factor for us to consider. . . . Reaching out to touch Rideau's pocket was a limited and tailored response to [the officer's] fears for his safety . . . ."  <u>Id.</u> at 1575.  Importantly, the court added the following:  "[The defendant] was not put up against a wall or across a car and subjected to a shake down."  <u>Id.</u> at 1576.

Memories are short. A little more than a year after <u>Rideau</u>, the majority today endorses the very procedure that the majority in <u>Rideau</u> condemned. Perry did much more than "touch [Michelletti's] pockets." In Perry's words, he instructed Michelletti "to set the beer down on the car and put his hands on the car. And then I proceeded to perform a pat down search on him for weapons."

III.

In summary, the only "specific and articulable facts" that the record even remotely supports to link Michelletti to suspicious activity are that he exited a bar with a beer in one hand and his other hand in his pocket. He was in violation of no law (except of course the weapon possession with which he was charged, a fact the officer could not have known <u>ex ante</u>).

These facts are in conspicuous contrast to those in <u>Rideau</u>. There, this court construed the defendant's actions as threatening:

> When approached and asked his name, Rideau did not respond but appeared nervous and, critically, backed away. It was not unreasonable under the circumstances for [the officer] to have feared that Rideau was moving back to give himself time and space to draw a weapon. . . .
>
> . . . .
>
> . . . [A]fter Rideau was lawfully detained, he responded to the request of the officer by backing away )) a move which in this specific context was reasonably seen as threatening. [The officer] could reasonably believe that Rideau was gaining room to use a weapon.

969 F.2d at 1575.

The distinction is that once confronted by the officers in their execution of a valid <u>Terry</u> initial detention for questioning, the defendant in <u>Rideau</u> continued to engage in what the majority called suspicious activity. Moreover, that activity was viewed as directed toward the officers and implicating their safety, i.e., backing away to draw a gun on the officers. The majority held that this further activity entitled the officers to take the <u>Terry</u> stop one step further, as "[a] reasonably prudent man in [the officer's] situation could have believed that his safety and that of his partner was in danger." <u>Id.</u> at 1574.

By contrast, no reasonable officer could have believed that Michelletti was "armed and dangerous" except on the basis of the sort of "inchoate and unparticularized suspicion or `hunch'" that <u>Buie</u> condemns. <u>See</u> <u>Buie</u>, 494 U.S. at 332 (quoting <u>Terry</u>, 393 U.S. at 21). Perry's testimony directly undermines the majority's unsubstantiated claim that Michelletti walked toward the officers and that that action was threatening. Perry stated, "[H]e looked at me, we made eye contact, but then he looked away and acted as though I was not there and <u>tried to walk on by</u>." (Emphasis added.)

Also in sharp and significant contrast to the situation in <u>Rideau</u> is the fact that Michelletti, instead of continuing in suspicious activity once he was addressed by Perry, immediately cooperated:

> I asked him to come over here )) at the time I was
> already out of my car )) to come toward me so that I
> could check him for weapons. At that time I asked him to

set the beer down on the car and put his hands on the car. And then I proceeded to perform a pat down search on him for weapons.

While there may have been reason for the officers to question Michelletti briefly, under Terry, to see whether illegal activity was afoot, the total absence of threatening or suspicious conduct at that moment deprived the officers of justification to conduct a full-blown patdown of Michelletti's person.[11]

Even if we were to assume )) contrary to any hint in the record or the district court's findings )) that Michelletti was walking toward the three men who had been seen moving toward the bar's rear parking lot, his mere association with them did not justify a search, absent some suspicious conduct on his part. In Ybarra v. Illinois, 444 U.S. 85, 91 (1979), the Court pointedly observed that

a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. . . . [The requirement of particularized suspicion] cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . where the person may happen to be. The Fourth and Fourteenth Amendments protect the `legitimate expectations of privacy' of persons, not places.

Accordingly, in Ybarra the Court found no particularized suspicion even though Ybarra was in a bar next to a person whom the police had a warrant to search. Similarly, in Brown v. Texas, 443 U.S. 47, 52 (1979), the Court held that the police failed to demonstrate

---

[11] As the majority rightly notes, the state court of appeals, albeit with a record different from the one before us, concluded that the officers had not articulated sufficient facts to justify the Terry frisk. See Majority op. at 7 n.3.

a particularized suspicion of two persons who were walking away from each other in an alley in a high-crime neighborhood and who "looked suspicious."

An examination of cases in which the Court <u>has</u> found individualized suspicion is instructive. Remarkably, the majority attempts to compare the facts here favorably to those in <u>Terry</u>. There, an experienced police officer on his beat observed in detail, for ten to twelve minutes, the suspicious activities of three men as they "cased" some retail stores, apparently in preparation for a robbery. <u>Terry</u>, 392 U.S. at 5-6.[12] It was obvious to any reasonable officer that if a robbery was being planned, one or more of the suspects would have a gun. So, it was

---

[12] The Court described the salient facts as follows:

[The officer] saw one of the men leave the other one and walk . . . past some stores. The man paused for a moment and looked in a store window, then walked on a short distance, turned around and walked back toward the corner, pausing once again to look in the same store window. He rejoined his companion at the corner, and the two conferred briefly. Then the second man went through the same series of motions, strolling down [the street], looking in the same window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner. The two men repeated this ritual between five and six times apiece )) in all, roughly a dozen trips. At one point, while the two were standing together on the corner, a third man approached them and engaged them briefly in conversation. This man left the two others and walked west[, and the first two] resumed their measured pacing, peering and conferring. After this had gone on for 10 to 12 minutes, the two men walked off together, heading west . . . , following the path taken earlier by the third man.

By this time Officer McFadden had become thoroughly suspicious. He testified that after observing their elaborately casual and oft-repeated reconnaissance of the store window . . . , he suspected the two men of "casing a job, a stick-up," and that he considered it his duty as a police officer to investigate further. He added that he feared "they may have a gun."

<u>Terry</u>, 392 U.S. at 6.

wjl:\opin\92-8274.spe
hrd

24

only logical for the officer, when conducting the initial <u>Terry</u> stop, to search for weapons, which he indeed found.

The officer's observation of several minutes' duration in <u>Terry</u> is in marked contrast to the instantaneous conclusion here to search Michelletti without any real reason to think he was both "armed and dangerous." <u>See</u> <u>Adams v. Williams</u>, 407 U.S. 143, 147-48 (holding that officer had particularized suspicion that defendant was armed and presently dangerous where a known informant reported moments earlier that the defendant was carrying narcotics and a concealed weapon, and defendant was sitting alone in a car in a high-crime area at 2:15 a.m.). It is astonishing that the majority asserts that in the instant case, "Perry's suspicion was no less reasonable than that which the Supreme Court approved in <u>Terry</u>." Majority op. at 8.

IV.

What the majority today has done is to espouse a "group danger" theory of search justification that is, to say the least, troubling. That theory seems to say that if a person finds himself amongst other persons who may pose a danger, or in a circumstance that, because of the time of day or the part of town, may suggest an increased possibility of criminal activity, that person may be searched without "particularized facts" or individualized suspicion" <u>as to him</u>.

The majority begins its explication of this theory by establishing reasonable suspicion as to the other men outside the bar:

> There should be no question that the police officer articulated a reasonable basis to investigate the group of patrons standing outside the rear of Alacran's lounge. This issue was not really disputed in the district court. The man who had just turned and run evasively at the mere sight of a patrol car had joined two others. The police could not know what these actions might mean, but they were entitled to find out.

Id. at 6. Significantly, Perry testified that "at that very instant, there was nothing threatening except for the fact that one subject that I had first seen was coming around the corner and he was slightly out of breath."

It is uncontroverted that that person was one of the three others, not Michelletti. But the majority insists upon making Michelletti answerable to the situation at hand and subject to search because of it:

> Other circumstances surrounding the encounter signaled a need for caution. First, it was closing time at a bar, a late hour when the presumably sell-lubricated habitués would begin heading for home )) or for trouble. The officers were well aware of a higher likelihood of angry confrontations at closing time. Second, the officers did not know whether they were confronting one suspect, two suspects, or all four of the men outside the bar as suspects in criminal activity. The size of the group added to the calculation of danger for the police and for any of the group's innocent members.

Id. at 10-11.

The flaw in this approach is that it eviscerates the requirement of individualized suspicion that is so basic to our Fourth Amendment jurisprudence. As the Court explained in Ybarra,

444 U.S. at 91, one's physical proximity to suspicious persons does not subject him to search. The dangerousness of the overall situation does not erode one's expectation of privacy and subject him even to a patdown )) a "frisk for weapons" that the Supreme Court recently has reminded us "`constitutes a severe, though brief, intrusion upon cherished personal security.'" Buie, 494 U.S. at 332 (quoting Terry, 392 U.S. at 24-25).

Equally alarming is the emphasis placed by the district court and today's majority on the officer's awareness that a fellow officer had been fatally shot only two weeks earlier. See Majority op. at 14. The killing of peace officers is a tragic and deplorable, but not wholly avoidable, consequence of that line of work. Terry and its progeny afford officers a reasonable opportunity to ensure their safety in the field, but only where the suspect at hand has aroused individualized suspicion. There is no hint in our or the Supreme Court's Fourth Amendment pronouncements that the recent death of another police officer somewhere else in a large city can in any way erode the constitutional rights of those who thereafter walk the streets of that city. The majority also emphasizes the dramatic increase in death and injury among police officers. Again, the statistics are frightening, and one must have sympathy for officers who daily put themselves in harm's way. But again, these unhappy facts must not be allowed to intrude upon the security of the person in his freedom from unreasonable searches and seizures.

Protection of constitutional rights is most significant at the margins. Vigilance in protecting free speech, for example, is most important where the speech is unpopular, though such protection may be both more distasteful and more difficult. Likewise, recognition of basic liberty interests is most crucial where countervailing and sympathetic interests such as police safety are implicated.

The fact is that in an imperfect world, absolute protection for officers is not possible, nor is freedom from <u>reasonable</u> searches. That is why the law requires that the officer reasonably believe the suspect is armed and presently dangerous. Justice Scalia recently opined, in regard to a physical search, that "I frankly doubt . . . whether the fiercely proud men who adopted our Fourth Amendment would have allowed themselves to be subjected, on mere <u>suspicion</u> of being armed and dangerous, to such indignity . . . ." <u>Minnesota v. Dickerson</u>, 113 S. Ct. 2130, 2140 (1993) (Scalia, J., concurring). Concluding that no reasonable officer could have believed that Michelletti was both armed and presently dangerous, I respectfully dissent.