**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Marcus WADLEY, Defendant–Appellant.**

No. 94–10573.

United States Court of Appeals,
Fifth Circuit.

May 2, 1996.

F. Clinton Broden, Asst. Federal Public Defender and Ira Kirkendoll, Federal Public Defender, Dallas, TX, for appellant.

Madeleine B. Johnson, Jennifer E. Bolen, Asst. U.S. Attys., and Paul E. Coggins, U.S. Atty., Dallas, TX, for appellee.

*ON SUGGESTION FOR REHEARING*
*EN BANC*

Before DAVIS and WIENER, Circuit Judges, and VANCE *, District Judge.

PER CURIAM:

Treating the Suggestion for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. The Court having been polled at the request of one of the members of the Court and a majority of the Judges who are in regular active service not having voted in favor (FRAP and Local Rule 35), the Suggestion for Rehearing En Banc is DENIED.

WIENER, Circuit Judge, with whom POLITZ, Chief Judge, JERRY E. SMITH, STEWART and DENNIS, Circuit Judges, join, dissenting from failure to grant rehearing en banc.

[A] police officer, like any other citizen, has the right to approach an individual and ask him questions. The citizen has the corresponding right to walk away (hereafter, the *Morin* Maxim).[1]

More through inadvertence and misdirection than design, the opinion of the panel—of which I confess to having been a concurring member—puts the lie to our venerable pronouncement in *Morin*.[2] Worse, in refusing to rehear the panel opinion en banc, this court has furthered the alluvial dismantling of the Fourth Amendment in this circuit by

---

17. *Andrews.*

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. *United States v. Morin,* 665 F.2d 765 (5th Cir. 1982).

2. My inability to convince my colleagues to vote this case en banc may be attributable in part to

implicitly carving out an exception to the *Morin* Maxim—an exception which essentially renders this canon meaningless. For, henceforth, the constitutional right recognized in *Morin* will be unavailable to those citizens *who* need it most, *when* they need it most, and *where* they need it most—at night, in a high-crime, drug-infested, minority-inhabited "bad part of town." I hasten to add that, although I continue to disagree with the panel result, this is not the principal reason I write today. My greater concern is with the sotto voce manner in which this court—my court—produced that crippling exception to the *Morin* Maxim. I am compelled to write in defense of a principle broader even than the substantive issue at hand: I write in defense of candor.

We should mean what we say and say what we mean. If the *Morin* Maxim means what it says, the police violated it; conversely, if henceforth our *Morin* Maxim shall no longer mean what it says, we should have followed our strict *stare decisis* policy by meeting en banc to disavow or radically modify *Morin*.[3] Either way, our declarations should be *overt* and explicit. By refusing to vacate the panel opinion and rehear the case en banc, we have

not chosen either alternative forthrightly; rather, we have *covertly* selected the latter alternative. What the panel opinion creates and what the denial of rehearing en banc silently confirms is a "Po' Folks" exception to the *Morin* Maxim: From now on, a citizen can decline a police invitation to talk *unless* that citizen happens to be in a poor, crime-infested, or minority neighborhood.

## I

## FACTS AND PROCEEDINGS

At 9:00 p.m. on a cool November evening in 1993, ten Dallas Police Department squad cars descended from four different directions on Prince Hall Chamber Apartments (Prince Hall), a public housing project in a predominantly black, high-crime, drug-prevalent neighborhood of Dallas, Texas.[4] Fifty to sixty officers simultaneously deployed from the squad cars and began questioning residents about drug activity, attacks on police officers, and the threatened assassination of police officers.[5] At the time that the officers converged on Prince Hall, there were approximately 150 black persons in the area.

---

my own awkward position in it. After originally concurring in the panel's unanimous holding that probable cause existed, I reversed my position and urged a rehearing en banc after I read the Federal Public Defender's (FPD) Suggestion For Rehearing En Banc with its persuasive refocusing of the issue. Rather than focusing solely on the snapshot of the final encounter between Wadley and police to determine whether probable cause existed at that micro-moment, we are urged by the FPD's Suggestion to broaden our perspective and view the entire kaleidoscopic encounter by concentrating on each step after fluid step, from beginning to end, of the circumstances and actions that gave rise to each factor of probable cause. Following that "suggestion," I will demonstrate that the police created and then escalated an intimidating situation, pursuing and harassing Marcus Wadley until, out of whole cloth, they "manufactured" exigent circumstances and thus probable cause. By focusing solely on the final seconds of the encounter, our panel missed the real issue and thereby erroneously held that what was in truth Wadley's exercise of his *Morin* rights produced probable cause for his arrest. More problematic and more invidious, our mistake—holding, at least implicitly, that Wadley's "walking away" contrib-

uted to probable cause—carves out a *low-rent* exception to the *Morin* Maxim.

3. In this circuit, one panel may not overrule the decision, right or wrong, of a prior panel in the absence of en banc consideration or superseding decision by the Supreme Court. *See, e.g., Brown v. United States,* 890 F.2d 1329, 1336 (5th Cir. 1989); *In re Fox,* 902 F.2d 411, 413 (5th Cir. 1990).

4. In reviewing the district court's rulings, which were based "upon testimony at a suppression hearing," the court " 'must accept the district court's factual findings unless they are clearly erroneous or are influenced by an incorrect view of the law.' " *United States v. Thomas,* 12 F.3d 1350, 1366 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1861, 128 L.Ed.2d 483 (1994) (quoting *United States v. Garcia,* 849 F.2d 917, 917 n. 1 (5th Cir.1988)).

5. This "raid" was not a chance occurrence. The Dallas Police Department had carefully planned and coordinated this effort. It was to be a fact-finding "dragnet" aimed at obtaining any and all information on drug activity and reported threats of violence against police officers in the Prince Hall area.

When Craig Adams, one of the officers involved in the fact-finding "raid," parked his squad car on Dixon Circle and got out, Marcus Wadley was standing on the sidewalk some twenty feet away, with his hands in his pockets, talking with a companion.[6] Officer Adams did not know Wadley, did not have any information about Wadley, and did not harbor any suspicions that Wadley was involved in criminal activity. By all accounts, there was nothing subjectively suspicious about Marcus Wadley.[7] Neither is it claimed that there was anything objectively suspicious about one black man standing where he was, early in the evening, with his hands in his pockets, talking to his black companion.

Solely in the hope that Wadley might have information about illegal activity in the vicinity, Officer Adams called out, "I want to talk with you" (First Communication). Adams did not, however, explain why he wanted to talk to Wadley. In response to this invitation, Wadley said nothing; he simply turned and began to walk away from Officer Adams—no furtive looks, no questionable moves, no sprinting away, nothing but a normal walk. Yet despite Wadley's unsuspicious and nonthreatening act of simply walking away, Adams failed to allow the encounter to terminate, as he should have under *Morin.* Instead, he persisted, again calling out to Wadley (Second Communication), this time insisting, without any legal justification whatsoever, that Wadley "needed" to stop and speak with the officers—not, vice versa, that *they* "needed" to talk with him.

Even in the face of this second police command, Wadley neither said nor did anything untoward; he simply continued to walk away, albeit at a somewhat "increased pace."

But again, Officer Adams would not allow the encounter simply to terminate. Instead, Officer Adams continued to press his pursuit of a conversation with Wadley.

With Officer Adams now "on his heels," Wadley was finally pushed to the point of accelerating from a walk to a run. When he did so, Officer Adams reacted by yelling, "Stop bolting. You are under arrest!" (Third Communication). At that moment Wadley apparently noticed that several officers were converging on him. Attempting to elude them, Wadley reversed field, running back towards Adams. Realizing that he was trapped, Wadley—either just before he was tackled or contemporaneously therewith—reached into his pocket, pulled out a brown paper bag, and tossed it toward a trash dumpster, all in a single fluid motion. The officers then wrestled Wadley to the ground and subdued him. Later, Officer Adams retrieved the bag and discovered that it contained numerous plastic zip-lock bags of crack cocaine.[8]

Before trial, Wadley filed a motion to suppress (1) the evidence recovered at the time of his arrest and (2) his post-arrest confession. Wadley argued that the arresting officers lacked probable cause to arrest him and that all the evidence obtained, including the bag thrown at the time of arrest, was the product of an illegal arrest, and thus classic "fruits of a poisoned tree." At the suppression hearing, the district court (like our panel) focused not on the initial, escalating stages of the encounter between Officer Adams and Wadley, but solely on the final chase-tackle-and-toss, akin to the incident made famous in *California v. Hodari D.*[9]

---

6. Adams recalled that Wadley had either one or both of his hands in his pockets, but added that even that was not suspicious given the cool night temperature.

7. The three witnesses who testified at the suppression hearing were all government witnesses; there were no factual disputes.

8. A subsequent search of Wadley's person revealed additional crack cocaine, $500 in cash, a pager, and business cards. Additionally, at the local FBI headquarters, officers questioned Wadley. Waiving his *Miranda* rights, Wadley gave the FBI agents the name of his drug supplier and confessed to selling drugs for this supplier on a weekly basis. Wadley was charged with one count of possession of cocaine with the intent to distribute.

9. 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (evidence abandoned prior to seizure is not fruit of seizure and is not subject to the exclusionary rule). As footnoted in the panel opinion, its decision was not grounded in the abandonment theory of *Hodari D.*

The district court denied Wadley's motion to suppress, finding that the officers had probable cause to arrest Wadley and that the paper bag was tossed simultaneously with the tackle.

Wadley timely appealed, challenging the district court's denial of his motion to suppress. On appeal, the panel (on which I served) rendered an opinion (in which I concurred), affirming the district court. Like the district court before us, however, our panel focused exclusively on the final chase-tackle-and-toss; and therein lay the genesis of our fundamental mistake. I am convinced that had we not conducted our review with such tunnel vision, considering only the final frame of the "game film" rather than each frame in sequence to see how each purported element of probable cause arose, we would have reached a different result. More importantly, we would have left the *Morin* Maxim intact for the protection of all citizens, free of qualifications based on the time and place of the police encounter.

## II

### ANALYSIS

#### A. Police–Citizen Encounters And The Fourth Amendment

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ..." [10] The specific content and incident of this right are shaped by the context in which it is asserted. For "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." [11]

Encounters between the police and citizens involve myriad situations and are complicated by a host of variables.[12] In efforts to deal with all of the combinations and permutations, courts classify police-citizen encounters in three generic categories.[13] The first category consists of mere communications involving neither coercion nor detention. As confirmed in *Morin*, a police officer, like any other citizen, has the right to approach an individual and ask him questions; in turn, the individual has the corresponding right to walk away.[14]

The second category, known as *Terry*-stops, comprises brief seizures of the person if the police have a *reasonable suspicion*.[15] To stop a citizen who does not voluntarily submit to questioning, an officer must possess specific articulable facts which together provide a reasonable suspicion that criminal activity is afoot.[16]

The final category, arrests and full-blown seizures, requires *probable cause*.[17] It does not exist unless "the facts and circumstances within the arresting officers' knowledge are sufficient in themselves to warrant a [person] of reasonable caution in the belief that the person to be arrested has committed or is committing an offense." [18]

These three categories, with their increasingly stricter standards and their different levels of permissible police intrusion, reflect the judiciary's constant struggle to maintain

---

10. U.S. Const. amend. IV.

11. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960).

12. *Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968) ("They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life.").

13. *See generally, United States of America v. Harlan*, 35 F.3d 176, 178–79 (5th Cir.1994) (citing *United States v. Bradley*, 923 F.2d 362, 364 (5th Cir.1991) (citing *United States v. Berry*, 670 F.2d 583, 591 (5th Cir.1982) (en banc))).

14. *Morin*, 665 F.2d at 768.

15. *See Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883.

16. *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir.) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994).

17. *United States v. Bradley*, 923 F.2d 362, 364 (5th Cir.1991) (citing *United States v. Berry*, 670 F.2d 583, 591 (5th Cir., Unit B, 1982) (en banc)).

18. *United States v. Mendez*, 27 F.3d 126, 129 (5th Cir.1994) (citing *United States v. Orozco*, 982 F.2d 152, 154 (5th Cir.), *cert. denied*, 508 U.S. 945, 113 S.Ct. 2430, 124 L.Ed.2d 650 (1993)).

a balance between two important societal interests: (1) every citizen's constitutional right to be free from unreasonable searches and seizures; and (2) the safety of police officers and citizens in general.

## B. WADLEY'S POLICE-CITIZEN ENCOUNTER

Although a chronological review is generally the clearest and most coherent way to analyze a series of events, in this case a different sequence initially proves more useful and illuminating. Therefore I shall look first at the ultimate facet of the encounter— the final frame of the film strip—and isolate each of these factors, which the district court found, in combination, added up to probable cause as of that moment. Then, with these factors identified, I shall return to the beginning of Wadley's encounter with the police and demonstrate how each factor—purportedly "exigent circumstances" justifying an arrest without a warrant—is either insignificant in context or was "manufactured" by the police.

### 1. *The Seizure and Probable Cause*

I begin where the encounter ended, with the arrest of Wadley. The government asserts that the combination of three factors provided probable cause to make that warrantless arrest: (1) Prince Hall was a high crime area; (2) Wadley fled from Officer Adams; and (3) Wadley reached into the inner pocket of his jacket. The district court agreed, and our panel affirmed.

It is undisputed that alone and in isolation none of these factors would be sufficient to constitute probable cause.[19] *See United States v. Vasquez,* 534 F.2d 1142, 1145 (5th Cir.), *cert. denied,* 429 U.S. 962, 979, 97 S.Ct.

389, 489, 50 L.Ed.2d 330, 587 (1976); *United States v. Tookes,* 633 F.2d 712, 716 (5th Cir. 1980).[20] When considered in combination, however, probable cause becomes a close call *if,* like our panel,[21] one looks only at the final episode and not at each step of the encounter preceding that final episode.

I have never taken issue with the narrow conclusion that, under other circumstances, a combination of these three exigent circumstances could constitute probable cause. Rather, I have urged that in this particular case we should re-examine each factor to see how it came about.[22] It is one thing for legitimate "exigent circumstances" to justify a warrantless arrest; it is an entirely different matter when the police create or "manufacture" exigent circumstances by provoking a citizen to take action that he would not have otherwise taken—especially when the provocation violates some tenet as basic as the *Morin* Maxim.

### 2. *Terry–Stop*

Typically, my next inquiry would be whether the officers had a reasonable articulable suspicion sufficient to support a *Terry*-stop. In this case, however, there is no need to conduct that inquiry because the government has never contended, and neither the district court nor our panel ever considered, the *Terry*-stop issue. Indeed, the government has conceded that the encounter between Wadley and the officers sublimed directly from a "first category" non-coercive encounter to a full-blown "third category" probable cause arrest, without ever passing through the "second category" *Terry*-stop. There simply was no "in between." In retro-

---

**19.** For instance, absent a curfew or some other independent legal restriction, a citizen cannot be arrested for mere presence in a high crime area. In like manner, standing alone, a suspect's attempt to walk away or flee from a police officer is insufficient to create probable cause, *even if the suspect flees in a high crime area.*

**20.** *See United States v. Vasquez,* 534 F.2d 1142, 1145 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *United States v. Tookes,* 633 F.2d 712, 716 (5th Cir.1980). It seems equally true that absent other facts a citizen cannot be arrested for simply reaching into the breast pocket of his jacket.

**21.** *United States v. Wadley,* 59 F.3d 510, 512 (1995) ("[W]e conclude that the district court did not err in finding that the arresting officers had probable cause to arrest Wadley and that the arrest was valid.").

**22.** *United States v. Duchi,* 906 F.2d 1278, 1284 (8th Cir.1990) ("For the claim of exigent circumstances to be adequately evaluated, the ... question to ask is: how did those exigent circumstances come about?").

spect, I find this concession both telling and distracting: telling because it acknowledges that the police lacked a reasonable articulable suspicion to detain Wadley; distracting because, like the proverbial red herring, it drew our panel's attention away from a consideration of all aspects of the encounter that preceded the actual arrest and caused us to focus exclusively on the chase-tackle-and-toss portion of the encounter.

### 3. *The Encounter*

By expanding our examination to cover each stage and step of the whole encounter in chronological order, an entirely different picture emerges. According to Officer Adams, when he exited the squad car, he observed only that Wadley had either one or both hands in his pocket(s). There was nothing objectively suspicious, and Officer Adams' candid testimony confirms that he had no subjective suspicion that Wadley might be dealing drugs or involved in any other criminal activity whatsoever. At this point, Officer Adams could have neither arrested Wadley nor performed a *Terry* pat-down. The most that Adams could have done lawfully was to ask Wadley questions; and that is all that Adams attempted to do—at first!

In response to the First Communication, however, Wadley exercised his constitutional right under *Morin* and walked away. Emily Post may not have given Wadley high marks in etiquette, but his non-verbal response to Officer Adams sent the objective message, per *Morin*, that he did not wish to speak with the police. At that point Officer Adams lacked reasonable suspicion to "*Terry*-stop" Wadley. Likewise, he lacked probable cause to arrest Wadley. *Morin* teaches that, after Wadley started to walk away, Officer Adams should have broken off the encounter. But, he did not.

No, Adams persisted, informing Wadley (erroneously) in the Second Communication

that he "needed" to talk with the officers. And, for a second time, Wadley walked away, emphasizing his "regret" of the invitation by increasing his pace somewhat. Officer Adams still lacked both reasonable suspicion and probable cause; and again, under *Morin*, Officer Adams was obligated to break off the encounter at that point. Yet again, he did not.

No, Adams continued to apply the pressure until finally he provoked Wadley to run.[23] Still lacking probable cause, Adams nevertheless uttered the Third Communication, yelling (again erroneously) that Wadley must stop, that he was under arrest.

Finally, even when Wadley continued to run, Adams still should have broken off the encounter, yet he did not.

No, Adams chased after Wadley and, together with the other officers, tackled and arrested him.

### a. *Manufactured Exigent Circumstances: The Flight and The Reach*

We have long recognized that, alone, fleeing from law enforcement personnel or from a crime scene is insufficient to constitute probable cause to arrest the runner.[24] If the law were "otherwise 'anybody who does not desire to talk to the police and who either walks away or runs away from them would always be subject to legal arrest,' which can hardly 'be countenanced under the Fourth and Fourteenth Amendments.'"[25] This is particularly true when, as here, the flight in question is neither voluntary nor reflexive. Despite all the excitement and anxiety of the commando raid at Dixon Circle, Wadley never moved. He did not stumble; he did not move in a threatening or suspicious way; he did not stand his ground menacingly or defiantly; he did not even turn and walk away, much less break and run. In Wadley's case flight was merely the final result of repeated

---

**23.** That Wadley was finally pushed to the point of breaking into a run is particularly unsurprising—and thus unsuspicious—under the instant circumstances. *See California v. Hodari D.*, 499 U.S. 621, 630, n. 4, 111 S.Ct. 1547, 1552, n.4, 113 L.Ed.2d 690 (1991) (Stevens, J., dissenting) (citing Johnson, "Race and the Decision to Detain A Suspect," 93 Yale L.J. 214 (1983)).

**24.** *See e.g., United States v. Silva*, 957 F.2d 157, 160 (5th Cir.1992); *United States v. Vasquez*, 534 F.2d 1142, 1145 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976).

**25.** 2 Wayne R. LaFave, *Search and Seizure* § 3:6(d) (1987) (internal quotation omitted).

provocation and increasingly heightened harassment by the police: It was a manufactured exigent circumstance. As such, the flight should not have been taken into consideration in the probable cause rubric.

We must remember that the avowed purpose of the "raid" at Prince Hall was to question as many persons in the area as possible. It was *not* a drug bust; it was *not* a late night/early morning prowl car incident; it was *not* a response to a call to quell a disturbance or investigate a possible crime in progress. It was purely a planned, voluntary, fact-finding "fishing expedition" at a time and place preselected by the police. True, Wadley finally ran, but not until the police had repeatedly harangued and pursued him. Flight is relevant only when it is a reflexive or unprovoked act. Wadley's flight was neither reflexive nor unprovoked and should not have been considered as an exigent circumstance factor in the court's probable cause inquiry.

The government also asserts—and the district court agrees—that, in combination with other factors, Wadley's reach into his pocket was evidence of exigencies leading to probable cause. As a factor of probable cause, reaching into a pocket is one among the multitude of relatively innocuous actions which, in combination with other actions or factors, has been recognized by courts as establishing probable cause. Again, I am not here to dispute whether such a movement can ever be considered a factor in the search for probable cause. Rather, I am here to emphasize that, in this case, that factor should have been excluded because the police provoked it. They created it by pressing Wadley, in violation of the *Morin* Maxim, until he finally reached into his pocket as he was running. And, like running, Wadley's reaching into his pocket under these conditions must be deemed to be police-manufactured exigent circumstances, incapable of contributing to a determination of probable cause.

Even though he walked away, Wadley was repeatedly pressed and pressured until he reacted in a "suspicious" manner—running away. Such protracted pressure and pursuit by Officer Adams in the face of Wadley's efforts to walk away violated the *Morin* Maxim. *Morin* gave Wadley the right to walk away from Officer Adams. Wadley exercised that right—three times. And three times Officer Adams ignored Wadley's rightful exercise, finally yelling to Wadley that he was under arrest. It is *unreasonable* to allow an officer, through persistent yet unwarranted pursuit of a citizen, to manufacture exigent circumstances when none exist, particularly in a highly charged atmosphere.[26]

### b. *The Bad Neighborhood*

Finally, the government proffers Wadley's presence at Dixon Circle in Prince Hall, a "bad neighborhood," as a factor contributing to probable cause, as yet another exigent circumstance. In the context of the Fourth Amendment, this should continue to be absolutely irrelevant and immaterial. We have stated before that there is nothing suspicious, criminal, or wrong with being in a bad neighborhood.[27] A citizen does not gain or lose constitutional rights as he moves from neighborhood to neighborhood. One's Fourth Amendment rights remain the same, whether jogging in Beverly Hills or standing on a corner in Watts. Certainly, some neighborhoods are much "worse" than others. That is not my point. My point here is that when Wadley's flight and his reach into his pocket are excluded as factors that can be considered because they are police-manufactured exigent circumstances, there remains at least one conclusion that neither the police nor the courts can avoid: Marcus Wadley could never have been arrested for walking away from the police solely because he did so in a bad neighborhood.

We cannot permit Wadley's "mere presence" in a bad part of town to be elevated to

---

**26.** *United States v. Rico,* 51 F.3d 495, 502 (5th Cir.1995) ("exigent circumstances ... do not pass Fourth Amendment muster if the officers deliberately create them."), *cert. denied,* — U.S. ——, 116 S.Ct. 220, 133 L.Ed.2d 150 (1996).

**27.** *See, e.g., United States v. Rideau,* 969 F.2d 1572, 1575 (5th Cir.1992) (en banc) ("Of course, that an individual is in a high crime neighborhood at night is not enough to support an officer's decision to stop or frisk him.").

a per se exigent circumstance, which produces—or is even a factor bearing on—probable cause. This point is particularly true here, given the added feature of the police having selected the time and location for making their raid en masse. Even if we were to assume arguendo that "bad neighborhood" is an exigent circumstance, surely that added feature of selection of time and place constitutes *waiver* of it here.

Everything that transpired as a result of the police-created or manufactured exigent circumstances, and all evidence acquired from the warrantless arrest, purportedly based on those tainted factors, were classic fruits of a poisoned tree. Every shred of that evidence should have been suppressed.

## III

## CONCLUSION

My concern is not just that a panel of this circuit has placed its imprimatur on such an arrest and, in the process, rendered the *Morin* Maxim nugatory. What troubles me even more is our failure to address this matter head on. If *Morin* is no longer to be good law—or, even worse, if the *Morin* Maxim is to be suspended in bad neighborhoods—then as a court we should say so, forthrightly and expressly, and explain our reasons candidly. If we were not going to retain the *Morin* Maxim in fact, we should either have overruled *Morin* or articulated a manageable "low-rent" exception to that maxim, and in either case we should have done so en banc as only an en banc court can do. But to hide behind the denial of en banc reconsideration and do neither does not comport with this court's historical "upfront" way of doing business.

I regret that I was not able to convince a majority of my colleagues to revisit en banc the central Fourth Amendment issue presented by the entire encounter between Marcus Wadley and the Dallas Police Department. I am convinced that our readership will view this case as one in which our collective bluff was called, forcing this court either to (1) abide by the *Morin* Maxim or (2) confess that, while "a person in a middle class neighborhood may walk or even run away from police without giving police probable cause to arrest, . . . a minority in a poor, crime-infested neighborhood may not." [28] I am equally convinced that when our bluff was thus called and we had to show our hand, we couldn't beat a pair of deuces!

By refusing to rehear this case en banc, we chose to stand mute neither "putting our mandate where our mouth is" nor forthrightly admitting that we never have meant, and still do not mean, what we say about the right of a citizen to "just say 'No'" nonverbally by walking away. By taking no position, we ostensibly continue to mouth our hollow obeisance to the *Morin* Maxim, while failing to acknowledge that here in *Wadley* we have consciously whittled away yet another layer of the Fourth Amendment's protection from unreasonable seizures. We did that de facto in *Wadley* by implicitly creating an amorphous, *temporal/geographical/societal* exception to the constitutional right of a citizen to be free from such a seizure.

Our recent jurisprudential whittling has already pared down the Fourth Amendment's shield.[29] In the instant case, we further our creeping erosion of the Fourth Amendment, albeit *sub silentio*, by approbating a seizure under facts that imply—because we are not so ingenuous as to express it— that the *Morin* Maxim somehow evaporates *at night* (temporal), *in a high-crime/dangerous/bad part of town* (geographical), inhabited principally by *poor minorities* (societal).

More invidiously, this implicit "low rent" exception to the *Morin* Maxim—an exception whose paternity we sheepishly disavow through our silence—has neither the temporal definition of a curfew nor the geographic definition of an "off limits" ordinance. Instead, we abdicate to law enforcement per-

**28.** Appellant's Suggestion for Rehearing En Banc.

**29.** *See, e.g., United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Michelletti,* 13 F.3d 838, 840 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994); *United States v. Rideau,* 969 F.2d 1572, 1575 (5th Cir.1992) (en banc); *United States v. Ibarra,* 965 F.2d 1354 (5th Cir.1992) (en banc).

sonnel the unilateral discretion to decide, incident by incident, just when and where to invoke this exception. Perhaps each time hereafter, when the *Morin* Maxim is reiterated in one of our opinions, it will bear a footnote—like the accursed asterisk on the late Roger Maris' home run record—confessing today's implied low-rent exception.

If this court, sitting en banc, were to express a late night, high crime, bad neighborhood exception to the Morin Maxim, I could justify nothing more than a dissent on the merits. But when we only imply, through our mute *nolo contendere*, a denial that we have done precisely that, I simply cannot suffer in silence for our court. That is why I respectfully dissent from our refusal to heed Wadley's suggestion that we rehear his case en banc.