# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60095

United States Court of Appeals
Fifth Circuit

**FILED**

May 29, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

REGON HOLLIS HILL,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before DENNIS and PRADO, Circuit Judges, and BROWN, District Judge.*
JAMES L. DENNIS, Circuit Judge:

Defendant-appellant Regon Hollis Hill was sitting in his car with his girlfriend in her apartment complex's parking lot at 11:00 p.m. on a Saturday night when a multi-car convoy of police arrived. The convoy was driving around the county looking for suspicious activity. When the officers arrived at the apartment complex, they saw Hill's car legally parked, backed into its parking space. One of the police vehicles parked near Hill's car, and, at this point, Hill's girlfriend stepped out from Hill's car and started to walk briskly towards the apartment building. An officer got out, approached Hill's car, and

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

No. 13-60095

told him to roll down the window. Hill said that the window did not roll down and he opened the door instead. The officer asked, "Where's your gun?" Hill said that he didn't have one. The officer then asked whether he had a driver's license, and Hill responded that he did not. The officer ordered Hill to step out, turn around, and put his hands on top of the car so that he could be frisked. Hill complied, and the officer grabbed him by the waist to hold him in place. Then, the officer saw the handle of a firearm in Hill's pocket. Hill was arrested for, charged with, and convicted of possessing a firearm and ammunition after having been convicted of a felony, under 18 U.S.C. § 922(g)(1).

For the reasons hereinafter assigned, we conclude that the totality of the relevant circumstances, including the girlfriend's brisk departure from Hill's car and the circumstances that transpired during the seconds between her exit and the officer's seizure of Hill, did not amount to articulable facts from which an officer could reasonably suspect that Hill was engaged in criminal activity. Thus, the seizure violated the Fourth Amendment under *Terry v. Ohio*, 392 U.S. 1 (1968), and the firearm and ammunition obtained from the seizure must be suppressed. Because Hill's conviction was obtained with evidence that should have been suppressed, we vacate the conviction and sentence.

## I.

In early 2012, Jefferson Davis County, Mississippi, had, according to law enforcement officers, "several" unsolved homicides, "a good deal" of illegal drug activity, and "just overall" a rise in criminal activity. To respond to the increased crime in the county, the Mississippi Commissioner of Public Safety created a joint federal and state initiative aimed at increasing the "law enforcement presence in the area." As one officer described it, the officers participating in the commissioner's initiative were "conducting road checkpoints" and "proactive patrols," "making traffic stops," "talking with people that were on the side of the road," and doing "anything" else that would

2

No. 13-60095

"increase the law enforcement presence." On Saturday, June 23, 2012, a number of officers set out in a multi-officer, multi-car convoy—"just kind of a rolling patrol" looking for criminal activity.[1]

Agents James Elliott Burch and Brad Fowler, both with the Mississippi Bureau of Narcotics, rode together in a car driven by Burch. The convoy entered Prentiss, Mississippi, a town in Jefferson Davis County that officers believed had higher rates of crime than other parts of the high-crime county. The convoy proceeded to the Palmetto Estates apartment complex, which the officers believed to be a "hotspot" for crime. The convoy arrived at the apartments around 11:00 p.m. There was one vehicle in the convoy in front of Burch and Fowler and, as the convoy neared the apartment complex, that vehicle stopped to approach several people that were standing at the entrance to the parking lot. Burch and Fowler passed the first vehicle, intending to park and join the officers in questioning the people at the lot's entrance. But, after they passed the first police vehicle, they saw several other people outside, on the sidewalk, and they also noticed a car parked in the lot, backed into its space, and it had two people seated inside it. Seated inside were Hill and his girlfriend, but the officers did not know their identities at the time.

Instead of joining the other officers in questioning the people at the lot's entrance, as they initially planned, Burch and Fowler decided to approach the people in the parked car. The officers parked parallel to the car, several parking spots away, on the car's passenger side, and exited their vehicle. According to Fowler, as he exited, he noticed that the two people in the parked car "started paying attention to us, and the female, who was in the passenger seat, got out and started walking towards the apartment complex." In various

---

[1] One officer testified that there were "seven to eight" officers in the convoy in "three to four cars." Another officer testified that there were "at least seven" officers in the group.

parts of their testimony, Burch and Fowler variously described the woman's exit from the car and steps towards the apartment as "quick," "brisk," "rapid," "hasty," and "hurrying." Based on the woman's movements, it appeared to Burch that "she didn't want to talk to any of us and probably was trying to get into the apartment complex."

Burch approached the woman and began speaking with her. At the point Burch reached her, she had taken about "three or four" "strides" and moved about "four to six feet" away from the car. As Burch spoke with her, she "continued to kind of walk toward the apartment complex" while she talked.

Fowler testified that the woman's movements appeared suspicious: "They were sitting in a car; when we pulled up, she gets out and moves away quickly. I've seen it happen before in situations like this, and we have encountered narcotics in situations like that before." While Burch was talking with the woman, Fowler approached the car to speak with the man in the driver's seat, Hill, to investigate whether he was involved in a potential drug crime. Fowler knocked on the driver side window and told Hill to roll the window down. Hill replied that the window couldn't roll down and he opened the door instead. Fowler asked, "Where's your gun?"[2] Hill said that he didn't have one. Fowler asked whether he had a driver's license, and, again, Hill replied that he did not. Fowler told him to step out of the car, and he did. Fowler made a motion indicating that Hill should turn around to be frisked and Fowler ordered him to put his hands on top of the car. Hill complied. Fowler put his flashlight in the crook of his neck to free his hands, and he then, he testified, held Hill "by the waistband of his pants so he couldn't get away

---

[2] Fowler says that his tone was "kind of joking" because he "learned a long time ago" that "you get more flies with honey than you do with vinegar," so he has "always tried to be very nice to people."

No. 13-60095

from me." As Fowler held Hill in place, Fowler shined the flashlight craned in his neck on Hill's pants pocket and saw inside "the butt plate of a .45 automatic." Fowler reached for the gun, and, as he did, Hill's hands "came down." Fowler pushed Hill into the side of the car, grabbed the gun, threw it away, shouted for assistance, forced Hill to the ground, and handcuffed him.

On July 10, 2012, Hill was indicted on one count of possessing a firearm and ammunition while having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).[3] Hill moved to suppress the evidence seized during the stop and frisk, *i.e.*, the gun and ammunition, contending that the search and seizure were unconstitutional under the Fourth Amendment. After a hearing, the district court denied the motion, holding that Fowler had sufficient and reasonable suspicion to stop and frisk Hill. On October 30, 2012, Hill proceeded to a bench trial in which he was found guilty. He was subsequently sentenced to five years' imprisonment. He now appeals the district court's denial of his suppression motion.[4]

## II.

Warrantless searches and seizures are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). The rule of *Terry v. Ohio*, 392 U.S. 1 (1968), represents "a very narrow exception." *United States v. Tookes*, 633 F.2d 712, 715 (5th Cir. 1980).

---

[3] "It shall be unlawful for any person" "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." § 922(g)(1).

[4] Because we agree with Hill that the district court erred in denying his suppression motion, we do not reach Hill's legal arguments about his sentence.

5

No. 13-60095

Under *Terry,* if a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain—that is, "seize"—the person to investigate. *United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000) (discussing *Terry*). "Such a belief must be founded on specific and articulable facts rather than on a mere suspicion or 'hunch.'" *United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993); *see also United States v. Michelletti,* 13 F.3d 838, 840 (5th Cir. 1994) (en banc). In determining whether the officer's suspicion, as based on specific and articulable facts, was reasonable, the totality of the circumstances must be considered. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). The government has the burden of proving the specific and articulable facts that support the reasonableness of the suspicion. *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005). Whether the facts shown support reasonable suspicion is a question of law that we decide *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Oliver*, 630 F.3d 397, 405 (5th Cir. 2011).

As an initial matter, because a "seizure" under the Fourth Amendment must be "justified at its inception," we must determine when Hill was seized within the meaning of the amendment. *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004). A seizure begins when "all the circumstances surrounding the incident" are such that "a reasonable person would have believed that he was not free to leave." *INS v. Delgado,* 466 U.S. 210, 215 (1984) (citation omitted); *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003). Certainly, when Fowler ordered Hill to exit the car and gestured for him to turn around and put his hands on the car so that he could be frisked, Hill was not free to leave at that moment, and thus, Hill was seized then. Fowler testified that he was suspicious that Hill was engaged in a drug crime and it was for that reason that he seized Hill to investigate further.

6

No. 13-60095

Accordingly, the question for this court is, at the moment Fowler seized Hill by ordering him out of the car to be frisked, whether Fowler's suspicion that Hill was, or was about to be, engaged in a drug crime was reasonable and supported by specific and articulable facts.

The complete set of circumstances at play when Fowler ordered Hill out of his car to be frisked paints the following composite picture: Hill, without a driver's license, at 11:00 p.m. on a Saturday night, in an apartment complex that has a drug reputation and is in a high-crime county, was sitting in the driver's seat of a car that was backed into a parking spot, and, when the police arrived, his passenger exited from the car and took a few steps away. The officers came across this scene while they were driving through the county as "just kind of a rolling patrol" and they had no specific reason to suspect any particular criminal activity at the apartment complex where they saw Hill's parked car. Only a matter of seconds elapsed between the officers' seeing Hill's car and Fowler's seizure and frisk of Hill.

Considering all the relevant circumstances together, we are not persuaded that, at the moment Fowler ordered Hill to get out of his car, to turn around, and to place his hands on the car so he could be frisked, there were specific and articulable facts upon which to form a reasonable suspicion that Hill had been engaged in criminal activity. The government attempts to put an ominous gloss on what appears almost entirely ordinary. The general picture that emerges, considering all relevant factors together, is of a man and a woman sitting in a car parked in the lot of an apartment building, on a weekend night, at the moment the police arrived. Hill and his passenger "were not offending any traffic ordinance; there was no evidence of recent crimes in the neighborhood, no reason to suspect that [Hill] or his passenger were wanted by the police, and no other reason to believe that anything unusual was taking place." *See United States v. Beck*, 602 F.2d 726, 729 (5th Cir. 1979).

No. 13-60095

It warrants considering the sorts of circumstances the government did *not* show. This is not a case where the seizure followed a tip to the police of suspicious or criminal activity. When Burch and Fowler approached the Palmetto Estates apartment complex, they were not responding to any report of criminal activity nor did they have any particular reason to think that crime was happening there at the moment of their arrival. *Compare, e.g.*, *Alabama v. White*, 496 U.S. 325, 327 (1990) (anonymous telephone tip corroborated by police's observation of suspect). Nor is this a case where the seizure was of a person matching the description of anybody sought by the police. Burch and Fowler were neither looking for Hill specifically nor anybody who looked like him. *Compare, e.g.*, *United States v. Campbell*, 178 F.3d 345, 347 (5th Cir. 1999) (seized person's physical appearance and motor vehicle matched description of bank robber and getaway car). Nor is this a case where the police came across a person, had a hunch that something could be amiss, and then observed the suspect for sufficient time to determine that criminal activity indeed reasonably appeared to be afoot. Only seconds elapsed from the first moment the officers saw Hill in his car and when Fowler ordered him to exit the car to be frisked. *Compare, e.g.*, *Terry*, 392 U.S. at 5-6 (officer observed suspicious behavior for "10 to 12 minutes" before approaching). And, the officers do not claim that, during those few seconds, they observed Hill making any suspicious movements. The officers found Hill sitting in his car, and, according to the evidence in the record, he apparently just sat there during the few seconds when the officers approached. *Compare, e.g.*, *United States v. Miles*, No. 00-11425, 2001 WL 1465241, at *3 (5th Cir. 2011) (unpublished) (suspect "reclined in the driver's seat of his automobile, apparently in an attempt to go unnoticed" and was observed "reach[ing] to the passenger's side of the automobile as if to hide something under the seat").

8

No. 13-60095

In attempting to argue that the circumstances here did give rise to a reasonable suspicion of criminal activity, much of the government's argument focuses on the contention that Hill was in a "high-crime area." The fact that law enforcement officers know a particular area to be high in crime is indeed a "relevant contextual consideration." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). That factor, however, comes with an important disclaimer: "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.*; *accord Brown v. Texas*, 443 U.S. 47, 52 (1979); *United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992) (en banc). The government cannot, in other words, justify a warrantless search or seizure with nothing more than incantations about the "proverbial 'high crime area.'" *United States v. Navedo*, 694 F.3d 463, 471 (3d Cir. 2012); *accord Brown*, 443 U.S. at 52.

Here, the government presented some evidence of a rise in crime particular to the town of Prentiss and the Palmetto Estates apartment complex. Burch testified that he had "been told that," at the Palmetto Estates, "there had been arrests made there for drug crimes in the past," although he did not know how many arrests or over what period of time. He also testified that, in Prentiss "over the past several months," "the crime seems to have been higher than in other areas." Similarly, Fowler testified that it was "known" to his office "that drug activity occurs in Prentiss." And, Fowler testified that he had been present at the Palmetto Estates "on at least two separate occasions" when arrests were made there. The government is correct that this testimony, even though it is vague and generalized, presents "relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124. However, the testimony cannot bear the weight the government wants to put on it. Considering Burch's and Fowler's testimony in the light most favorable to the

government, it is apparent that the Palmetto Estates had a reputation for drugs, but that, "standing alone, is not enough" to support a reasonable suspicion that anybody found there is involved with drugs. *Id.*

Moreover, much of the government's argument about the arrest here occurring in a "high-crime area" rests not on the apartment complex or even the town where Hill was arrested but rather focuses on the contention that the *entire county* of Jefferson Davis, Mississippi (which, Fowler testified, is "a fairly large county"), in general, rather than any particular part of it, is "a very dangerous place." For example, Burch testified that there had been "several unsolved homicides" in the county, but he did not know whether they occurred anywhere near where Hill was arrested, nor did he connect the homicides to Hill in any other manner whatsoever. This vague testimony about the "overall" rise in crime in the "fairly large county" tells us almost nothing about whether the police had reasonable suspicion to seize Hill at one single apartment complex, in one single town within the county. *Compare Brown*, 443 U.S. at 52 ("neighborhood frequented by drug users"), *and Rideau*, 969 F.2d at 1575 ("high crime neighborhood").

The government further argues that, not only was Hill in a "high-crime area," but he was there at night, which, according to the government, is further reason for suspicion. Indeed, a person's presence in "a high crime area" "at night" is relevant. *Rideau*, 969 F.2d at 1575. But, again, it is "not in and of itself enough to support an officer's decision to stop or frisk." *Id.*; *accord United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009). For one, Hill was not out at an unusual hour of the night, but only at around 11:00 p.m, and on a weekend night too. *Cf. Michelletti*, 13 F.3d at 845 (DeMoss, J., concurring) (stating that, at 2:00 a.m., "the overwhelming majority of law-abiding citizens are at home in bed"). And, more importantly, on the weekend night in question, Hill was not doing anything unusual for the 11:00 p.m. hour, such as, say, rummaging

in the bushes, but was rather simply sitting with a woman in his car in the apartment parking lot.  No reasonable officer who happens upon a couple sitting in a car in an apartment complex parking lot on a weekend night would, without more, suspect criminal activity.

The government points out that Hill's car was backed into the parking space, which, Burch and Fowler testified, is sometimes how people park when they want to conceal their license plate and, by extension, their identity, the officers have learned from experience.  It is true that we view the facts in light of the officer's experience, *Michelletti,* 13 F.3d at 841, and Burch and Fowler did testify that they have experience with people backing into spaces to hide their tags.  But it is also true, on the other hand, as Burch testified, that "lots of people" back into parking spaces for an entirely innocent reason: because "it makes it a lot easier to get out."  As Burch essentially conceded, the fact that a car is backed into a parking space is of little persuasive value in evaluating reasonable suspicion.

Next, the government turns to Hill's girlfriend's movements.  After Burch and Fowler parked and as they approached Hill's car, Hill's girlfriend exited the car and moved towards the apartment building in a manner that the officers said was "quick," "brisk," and "hurrying."  The government contends that the girlfriend's "hurrying" exit from the car and few steps towards the apartment provided reason to suspect criminal activity.

In *Illinois v. Wardlow*, the Supreme Court confirmed that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." 528 U.S. at 124.  The Court, however, recognizing that such behavior "is not necessarily indicative of wrongdoing," rejected the proposal for a bright-line rule that flight by itself establishes reasonable suspicion.  *Id.* at 124-25; *see also id.* at 126 (Stevens, J., concurring in part and dissenting in part); *United States v. Jordan*, 232 F.3d at 449 ("*Wardlow* did not establish a bright-line

test."). Behavior that appears evasive could, of course, have any number of innocent explanations. *Wardlow*, 528 U.S. at 128-29 (Stevens, J.). In other words, "there are unquestionably circumstances in which a person's flight is suspicious, and undeniably instances in which a person runs for entirely innocent reasons." *Id.* at 129. Accordingly, in deciding whether apparently evasive behavior in conjunction with the other relevant circumstances establishes reasonable suspicion, context is key. *Id.* ("The inference we can reasonably draw about the motivation for a person's flight, rather, will depend on a number of different circumstances.").

Here, Fowler testified:

> We got out of the vehicle, we were just going to go talk to them, and as we got out, I noticed that they started paying attention to us, and the female, who was in the passenger seat, got out and started walking towards the apartment complex, kind of a quick motion. . . . She got out carrying a number of bags, like a backpack or another type of bag, and she was moving away rapidly. Lots of times, you know, in my experience, you run into people who are doing a drug crime of some sort, either using drugs or [engaging in] a drug transaction in a parked vehicle, because it's quiet and it's secure and you have a field of vision in case the police pull up and you can dart out the car.

Considering the totality of the circumstances of this case, Hill's girlfriend's movements, described by the officers as "quick," did not add up to a reasonable suspicion that Hill was engaged in criminal activity. Of critical importance is that only a matter of seconds passed between Fowler's and Burch's first seeing Hill and the girlfriend in the car and the officers' stopping and observing the girlfriend step out of the car and take a few steps towards the apartment. Considering that the officers had no particular reason to suspect criminal activity at the apartment complex at the time they arrived (that is, there was no tip or other particularized cause for believing that

anything was afoot), there is little basis to infer anything from the fact that the girlfriend exited the car at the same time the police arrived on the scene. Of course, she *could* have exited the car out of a desire to flee from the police; or, she could have simply exited the car because Hill drove her home, they finished saying their "goodbyes," and she was preparing to go inside. *See United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997) (vehicle's departure after police walked past was not suspicious because the "passenger had just gotten into the car, so a prompt departure could be expected"). The point is, because the officers did not observe the scene for more than a few seconds and they had no other reasons to reasonably suspect criminal activity, such as a tip, they lacked a reasonable basis to infer much of anything about the girlfriend exiting the car and taking a few steps towards the apartment during the same time as their arrival. This is not a case of "[h]eadlong flight" at "the mere sight of a police officer."[5] *Compare Wardlow*, 528 U.S. at 121-22, 124 (police had reasonable suspicion to seize man who "looked in the direction of the officers" and "ran"), *and Michelletti*, 13 F.3d at 841 (police had "reasonable basis to investigate" "man who had just turned and run evasively at the mere sight of a patrol car"). Rather, it is a case of a few "quick" strides in an apartment complex's parking lot, from a parked car towards the apartment residence, in circumstances that are far more ordinary and, thus, far less reasonably suspicious.[6]

Moreover, the question presented is not whether the officers had reasonable suspicion to seize the girlfriend, who walked away quickly, but rather whether the officers pointed to specific, articulable facts that cast

---

[5] Fowler testified that "she didn't run away, she walked away quickly."

[6] We see very little to nothing suspicious about the fact that, according to Fowler's testimony, Hill and the girlfriend "started paying attention to [the officers]" as they approached. This seems to us a natural response to approaching police.

reasonable suspicion on Hill, who stayed seated in his car and made no suspicious movements. *See Navedo*, 694 F.3d at 468 ("The Supreme Court has never viewed *Terry* as a general license to detain everyone within arm's reach of the individual whose conduct gives rise to reasonable suspicion."). Of course, the girlfriend's quick movements might reflect to some extent on Hill too, since she just exited the car in which they both sat, but the persuasive value of her movements vis-à-vis reasonable suspicion of him is relatively diminished.

When the girlfriend began to take her several strides away, Hill was seized almost immediately thereafter. Fowler approached Hill and asked him to roll down the window, but Hill said the window could not roll down and he opened the door instead. Fowler's next question was, "Where's your gun?" Hill said he didn't have one. Fowler asked whether he had a driver's license, and the answer was that he did not. Then, Fowler ordered Hill out of the car to be frisked. We do not see how any of Hill's three answers here (the window does not work, he does not have a gun, and he does not have a driver's license) support a reasonable suspicion that Hill was engaged in a drug crime.[7]

The government has not satisfied its burden under *Terry* of pointing to specific and articulable facts warranting reasonable suspicion of criminal activity.[8] In reaching this conclusion, we note that we have viewed the

---

[7] The government says without elaboration that Hill's lack of a driver's license was a "red flag." The government offers no explanation as to how the lack of a driver's license is probative of illegal drug activity and neither Fowler nor any other witness at the suppression hearing testified as to any connection between driver's licenses and drugs. Absent a reasonable explanation, we are unwilling to assume that a person without a driver's license in his possession is apt to have been committing a drug crime.

[8] At oral argument, the government attempted to raise several other ostensibly suspicious circumstances. For one, the government contended that Hill was wearing "baggy clothes." Second, the government attempted to attach some meaning (exactly what meaning was not clear) to the fact that the window of Hill's car could not roll down. And, third, at one point, the government said that Hill was "not complying," but when asked for clarification, the government was unable to articulate any actual instance of non-compliance with police orders. We do not find these further circumstances to provide specific, articulable bases for

No. 13-60095

evidence in the light most favorable to the government, as we must. *See United States v. Polk*, 118 F.3d 286, 296 (5th Cir. 1997). Nevertheless, we are still faced with a picture that is insufficient to give rise to reasonable suspicion of criminal activity. Essentially, the police, around 11:00 p.m. at night, happened upon a car, backed into its space in the parking lot of an apartment complex with a reputation for drugs, and, at the same time that they arrived, the car's passenger stepped out and took a few steps away. Reasonable officers in such circumstances would have very little cause to suspect criminal activity rather than, say, a couple who just arrived home on a weekend night and were preparing to go inside. Arguing otherwise, the government relies mostly on vague and generalized contentions about the whole "area" (which, in the government's argument, includes the entire county) being "high" in crime. Indeed, the evidence of a general rise in crime in the county "suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees." *Brown*, 443 U.S. at 52.

In conclusion, the warrantless seizure of Hill was conducted in the absence of reasonable suspicion that he was engaged, or about to be engaged, in criminal activity. Therefore, the seizure violated his rights under the Fourth Amendment, and the evidence obtained therefrom must be suppressed.[9]

### III.

For these reasons, the district court's denial of the motion to suppress the evidence is REVERSED and the conviction and sentence are VACATED.

---

suspicion of a crime and we decline to consider the government's argument about Hill's "non-compliance" because it does not accurately reflect the evidence in the record.

[9] Because we hold that the seizure itself was not supported by reasonable suspicion and thus ran afoul of the Fourth Amendment, we need not reach the question of whether Fowler had reasonable suspicion that Hill was armed and dangerous sufficient to justify the frisk. *See Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.").