**REVISED February 3, 2017**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10357

United States Court of Appeals
Fifth Circuit

**FILED**

February 2, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARCELO MONSIVAIS, also known as Marcelo Monsivais-Castro,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and JONES and DENNIS, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

The events leading to the arrest and conviction of Marcelo Monsivais occurred on the side of Interstate 20 roughly midway between Abilene and Fort Worth, in Palo Pinto County, Texas. On September 22, 2014, during daylight hours, Deputy John Baker of the Palo Pinto County Sheriff's Office and City Marshal Abel Saldana of Strawn, Texas, were on patrol in a marked sheriff's car traveling east on I-20 when they saw Monsivais walking east on the opposite side of the Interstate away from an apparently disabled truck. Baker

drove the squad car across the median and headed back toward Monsivais to offer him roadside assistance, or as they put it, to do a "welfare check."

Baker stopped the squad car on the side of the highway facing Monsivais as he approached and activated the car's emergency lights as a traffic safety precaution. Monsivais, however, did not stop but continued walking past the squad car in his eastbound direction (toward Fort Worth). About the time Monsivais passed the back of the squad car, the officers exited and Baker began asking Monsivais questions. Baker could not remember exactly what he said but thought his questions were about where Monsivais was headed, where he had been, and if he needed any help. The officers testified that Monsivais said he was heading to Fort Worth; that he appeared nervous and jittery, but was polite in responding to the questions; and that he repeatedly put his hands in his pockets, but took them out each time at Baker's request.

Baker testified that after approximately four minutes, he told Monsivais that he was going to pat Monsivais down for weapons "because of his behavior" and "for officer safety reasons." After being so informed, Monsivais told the officers that he had a firearm in his waistband. Saldana grabbed Monsivais's right hand, bent his arm behind him, and seized the firearm. Both officers then restrained and handcuffed Monsivais. When asked for identification, Monsivais directed the officers to his wallet in his pocket, where they found an expired Mexican passport. Their continued searches of his clothing revealed a pipe and two small baggies of methamphetamine. Monsivais was arrested and later charged with possession of a firearm while being unlawfully present in the United States. *See* 18 U.S.C. § 922(g)(5).

Monsivais filed a motion to suppress the evidence obtained as a result of the seizure and the searches. After a hearing at which the officers testified (but Monsivais did not), the district court denied Monsivais's motion to suppress, stating only that the "consensual encounter was transformed into a

lawful *Terry* frisk due to the Defendant's demeanor, remarks, and for officer-safety reasons." Monsivais pleaded guilty but reserved his right to appeal the denial of his motion to suppress. He timely appealed, arguing that the district court judge erred in failing to exclude the firearm and other evidence because the officers did not have reason to suspect him of a crime as a basis for an investigatory detention, or reason to suspect him of being armed and dangerous as a basis for a protective frisk for weapons. We agree that the district court's failure to exclude the firearm and other evidence was in error because the officers lacked a basis to reasonably suspect him of a criminal act before seizing him; therefore, we need not determine whether the officers also lacked reasonable suspicion that Monsivais was armed and dangerous.[1]

## I

While the Fourth Amendment generally requires officers to obtain a warrant before searching or seizing an individual, under the "very narrow exception" announced in *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may briefly detain a person for investigative purposes if they can point to "specific and articulable facts" that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). Although "reasonable suspicion" is more than a "mere hunch," it "need not rise to the level of probable cause." *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008) (quoting

---

[1] When a reviewing court determines that an initial investigatory stop was lawful, it must apply a different, more onerous standard to determine whether an ensuing frisk for weapons was lawful. This separate standard is more burdensome, in recognition that a frisk or pat down is "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 17 (1968). "[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009); *Terry*, 392 U.S. at 27. Thus, because the stop or detention of Monsivais was unlawful in the first place, the officers could not constitutionally proceed to frisk him or pat him down.

*United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). An "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion into the privacy of the detained individual. *Terry*, 392 U.S. at 21. To find that reasonable suspicion existed to justify a stop, a court must examine the "totality of the circumstances" in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop only if it finds that "the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

The standard for appellate review of reasonable-suspicion determinations is de novo. *Id.* at 275 (citing *Ornelas v. United States*, 517 U.S. 690, 691 (1996)). "The government bears the burden of showing the reasonableness of a warrantless search or seizure." *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (citing *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995)). In reviewing the denial of the motion to suppress, "[w]e view the evidence in the light most favorable to the party that prevailed in the district court," in this case, the Government. *United States v. Solis*, 299 F.3d 420, 435–36 (5th Cir. 2002) (quoting *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001)).

Under the principles established by the Supreme Court, it is undisputed that Deputy Baker effectively seized Monsivais when he announced that he was going to pat him down; Deputy Baker thereby clearly asserted his authority as a peace officer to seize Monsivais so that any reasonable person in Monsivais's position would have known that he had been detained at that moment and was no longer free to walk away. *See Florida v. Royer*, 460 U.S. 491, 501–02 (1983) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)); *see also* 4 WAYNE R. LAFAVE, SEARCH AND

SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(a) (5th ed. 2012) (discussing *Mendenhall-Royer* "free to leave" test). In so doing, Deputy Baker converted the officers' roadside assistance or "welfare check" into an investigatory stop or detention of Monsivais. The Government agrees that Deputy Baker's seizure and frisk of Monsivais commenced when Baker announced that he was going to pat Monsivais down. Therefore, the focal point of our analysis is whether the totality of the relevant circumstances that transpired before Deputy Baker's announcement of the pat-down revealed articulable facts from which an officer could reasonably suspect that Monsivais had committed, was committing, or was about to commit a criminal offense. If the totality of circumstances did not, we must conclude that Deputy Baker's seizure of Monsivais did not fit within *Terry* or any other exception to the warrant requirement and was a violation of the Fourth Amendment.

## II

The police officers testified that prior to Monsivais's seizure they did not suspect Monsivais of any criminal activity. Deputy Baker, who at the time had made more than 100 traffic stops in his career, testified that when he got out of the patrol car to speak to Monsivais he did not place his hand on his weapon or disconnect its clip as he would have in a traffic violation stop situation. Deputy Baker further testified that when he first encountered Monsivais he did not suspect him of any criminal act; when he began to question Monsivais he did not suspect him of any criminal act; and when he told Monsivais he was going to pat him down, he did not suspect him of a criminal act, saying, "I wouldn't say a criminal act, no. He was just acting suspicious." Baker also testified that if he encountered a stranded motorist who ran away from him and his car's flashing lights, he would not pursue such a person, and that if Monsivais had not taken his hands out of his pockets as requested, Baker would have continued to request that Monsivais do so and "told him to keep

5

walking" if he did not comply. He testified that he would not have tried to detain Monsivais further or pat him down and that he believed Monsivais was free to walk away before he began the pat-down by announcing it to Monsivais. Marshal Saldana, who had over thirty years of experience as a peace officer, testified consistently with Deputy Baker that prior to Baker's announcement that he was going to pat Monsivais down and Monsivais's statement that he had a firearm in his waist, the officers had observed nothing that made them reasonably suspect that Monsivais had committed, was committing, or was about to commit a criminal act.

The Government argues, however, that the following facts, when considered together, support a reasonable articulable suspicion that justified the detention and frisk of Monsivais: (1) Monsivais's jittery demeanor and habit during questioning of putting his hands in his pockets; (2) his confusion as to where he had been and his allegedly inconsistent statement that he was headed to Fort Worth when his apparently disabled truck was pointed toward Abilene; and (3) the fact that he walked past and away from the squad car after the officers stopped and turned on their flashing lights.

To evaluate the Government's argument, we begin by assessing the value associated with each of the individual facts forming part of the relevant circumstances. We then evaluate these facts together, in logical relation to one another, in order to discern whether the totality of the circumstances prior to the seizure of Monsivais supports a reasonable suspicion of criminal activity.

A

The Supreme Court has said that "nervous, *evasive* behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (emphasis added). But, in the present case, there is no evidence that Monsivais acted evasively. "We have never held that nervousness alone is sufficient to create reasonable suspicion of criminal

activity. In fact, we often give little or no weight to an officer's conclusional statement that a suspect appeared nervous." *United States v. Portillo-Aguirre*, 311 F.3d 647, 656 n.49 (5th Cir. 2002). Many other courts look skeptically upon the probative value of an individual's nervousness in assessing whether reasonable suspicion of criminal activity exists. *See United States v. Chavez-Valenzuela*, 268 F.3d 719, 725–26 (9th Cir. 2001) (collecting cases). There are sound and compelling reasons for such skepticism. Nervousness is an "entirely natural reaction to police presence." *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005). And therefore "it is common for most people 'to exhibit signs of nervousness when confronted by a law enforcement officer' whether or not the person is currently engaged in criminal activity." *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997)). Accordingly, nervousness per se carries with it no readily discernible connection to criminal activity. *Cf. United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011) ("Nervousness, standing alone, generally is not sufficient to support reasonable suspicion.").

The evidence that Monsivais placed his hands in his pockets deserves equally little weight under the particular facts of this case for similar reasons. *See, e.g.*, *United States v. Williams*, 731 F.3d 678, 689 (7th Cir. 2013) ("[T]he simple fact that one's hands are in one's pockets is . . . . of little value. If one were to drive down any given street, it is likely that an uncountable number of citizens would have their hands in their pockets."). To begin, Monsivais complied each time Deputy Baker asked him to remove his hands from his pockets. Deputy Baker testified that he made this request during every citizen encounter. Thus, Baker made this request purely as a standard precaution he took when addressing citizens in traffic stops or other occasions, not only when he suspected that a person was guilty of a crime or was dangerous. Both officers testified that if Monsivais had refused to take his hands out of his

pockets, or had walked or run away, they would not have pursued him or arrested him, because they didn't suspect him of any criminal activity. The officers did not testify that Monsivais appeared to be holding something suspicious or dangerous in his pockets. To the contrary, the officers testified that Monsivais was polite and cooperative, and although he appeared to be nervous and jittery, he did not appear threatening "in any sort of way."

Regarding Monsivais's statement as to his destination, it is not clear that there was any inconsistency in his story. According to the officers, Monsivais told them that he "was headed" to Fort Worth, although his stalled vehicle was pointed in the opposite direction. However, Monsivais was in fact walking eastbound towards Fort Worth when he was stopped. The officers did not testify whether they asked Monsivais if Fort Worth was his ultimate destination or only the nearest place he thought he could find gasoline or whatever he may have needed for his vehicle.

Moreover, even if Monsivais spoke inconsistently about his ultimate destination, rather than consistently with the direction he was walking after leaving his disabled vehicle, that inconsistency did not link Monsivais with any reasonably suspected unlawful conduct. The Government mistakenly relies on *United States v. Fishel*, 467 F.3d 855 (5th Cir. 2006), and *United States v. Jones*, 185 F.3d 459 (5th Cir. 1999), two cases involving the permissible scope of questioning and searches after valid automobile traffic violation stops. In those cases, unlike in the seizure and detention in the present case, the investigatory detentions were based on officers' probable cause (i.e., more than reasonable suspicion) that the motorists had violated traffic laws. *Fishel*, 467 F.3d at 857 (improper lane usage, weaving, expired license); *Jones*, 185 F.3d at 463-64 (improper lane usage); *see generally* 4 LAFAVE § 9.3(a) ("[M]ost traffic stops are made based upon the direct observations of unambiguous conduct or circumstances by the stopping officer. That is, in most of the cases the stopping

will have been made on full probable cause." (footnote omitted)). Although the courts in traffic violation cases purport to apply a version of *Terry* to determine whether the length and intensity of the detention was unreasonable, the question of whether the initial traffic stop was constitutional is usually not at issue. In the present case, on the other hand, whether Deputy Baker's initial seizure of Monsivais was constitutional is the crucial issue. In deciding this issue, the basic principles of *Terry* must be applied with full force and effect. Consequently, traffic violation cases have little or no bearing on whether Deputy Baker and Marshal Saldana violated the Fourth Amendment by detaining and frisking Monsivais—a pedestrian—without reasonable suspicion that he had committed or was committing a violation of the law while walking along the side of the interstate highway after his truck became disabled.

Finally, the Government argues that Monsivais's walking past the officers' patrol car without asking for their assistance supports a reasonable suspicion that he was somehow involved in criminal activity. While it may be true that many individuals would gladly welcome police presence during an automobile malfunction, the Constitution does not command individuals to enthusiastically greet law enforcement under such circumstances. To the contrary, the Supreme Court has made it abundantly clear that unless a police officer has reasonable suspicion to conduct an investigatory stop, an "individual has a right to ignore the police and go about his business." *Wardlow*, 528 U.S. at 125.

The context in which a person seeks to avoid contact with a peace officer is important. Reasonable suspicion may arise when an individual flees from police in a high-crime area, *id.* at 124–25; when the officers are already patrolling the area in response to a specific report of criminal activity, *United States v. Tuggle*, 284 F. App'x 218, 225–26 (5th Cir. 2008); or when the police

have received a tip that the fleeing individual had committed a crime, *United States v. Holloway*, 962 F.2d 451, 460 (5th Cir. 1992). But these situations involve discernable facts or combination of facts specifically linking the fleeing individual to reasonably suspected criminality—e.g., flight *in a high-crime area* or flight *after receipt of a tip indicating criminality*. Unlike the facts in these situations, Monsivais's exercise of his right to avoid contact with the police and to go about his business offers no such linkage to reasonably suspected criminal activity. Moreover, Monsivais did not "flee" the officers, but merely walked past them.

## B

We turn now to assessing whether criminal activity by Monsivais could have been reasonably inferred or deduced once all of the facts are considered together in their totality. We conclude that, although Monsivais's behavior might not have been typical of all stranded motorists, the totality of the circumstances prior to Deputy Baker's announcement of a pat-down did not point to any reason to suspect Monsivais of criminal activity.

Our decision in *Hill* helps to illumine why the facts offered by the Government, considered all together, do not support a finding of reasonable suspicion in this case. In *Hill*, while on an investigative patrol, the police approached Regon Hill while he was sitting with his girlfriend in his car, which was parked in her apartment complex. 752 F.3d at 1031–32. An officer demanded to know where Hill's gun and his driver's license were. *Id.* at 1032. When Hill replied that he had neither a gun nor his driver's license, the police officer ordered him out of his car and conducted a frisk, during which the officer recovered a firearm. *Id.* To justify the stop and frisk, the Government emphasized that Hill's car was parked at an apartment complex in a "high-crime area"; that "he was there at night"; that he "was backed into [a] parking space, which . . . is sometimes how people park when they want to conceal their

10

license plate and, by extension, their identity"; and that Hill's girlfriend exited the car in a "hurrying" fashion when the officers began to approach. *Id.* at 1035–36.

This court held that Hill's detention was not supported by reasonable suspicion and was therefore unconstitutional. *Id.* at 1034. We observed that the Government, rather than pointing to specific and articulable facts that would support a reasonable suspicion of criminal activity, "attempt[ed] to put an ominous gloss on what appears almost entirely ordinary." *Id.* Dismissing the Government's argument that these facts gave rise to a reasonable suspicion, we concluded that "[r]easonable officers in such circumstances would have very little cause to suspect criminal activity rather than, say, a couple who just arrived home on a weekend night and were preparing to go inside." *Id.* at 1038.

A fundamental principle—derived from *Terry* and underlying our decision in *Hill*—provides critical instruction in the instant case. "[T]he essence of all that has been written is that the totality of the circumstances— the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417–18 (citing *Brown v. Texas*, 443 U.S. 47, 51 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)). Thus, if the totality of the circumstances prior to the seizure of the defendant does not provide a particularized and objective basis for suspecting the particular person seized of criminal activity, the seizure violates the Fourth Amendment. *Hill*'s reasoning recognizes that drawing a reasonable inference is a logical process of reasoning from known facts. *See Terry*, 392 U.S. at 21–22 (emphasizing the need for facts and "rational inferences" drawn from those facts, and distinguishing the latter from "inarticulate hunches"); *Arvizu*, 534 U.S. at 273

(emphasizing the importance of "mak[ing] *inferences and deductions*" from "cumulative information") (emphasis added). There must be some articulable premise—some fact linking that behavior to reasonably suspected criminality. Without that premise, there can be no objectively logical reason to impute criminality to a lawful range of behavior.[2]

Keeping these words and the need for an objectively logical step or path to *criminality* in mind, consider, by way of contrast, Professor LaFave's incisive discussion of the situation in *Cortez*, which he views as an "excellent illustration" of what would constitute a "reasonably specific statement by an officer of the circumstances underlying his action":

> [In *Cortez*] . . . , an otherwise innocent-seeming vehicle was stopped by Border Patrol agents because of a series of inferences drawn by those agents. Piecing together the limited information at their disposal, primarily what was learned from previously discovered tracks indicating the crossing of aliens from Mexico, they deduced: what night another group of aliens likely would be guided by the same person; what time the aliens were likely to arrive; the point on the highway at which they were likely to be picked up; the direction from which the pickup vehicle would likely come; the direction the pickup vehicle would then take; the likely number of aliens which would be brought; and the likely type of vehicle needed to pick up that number of aliens. In holding that a vehicle of that type moving at the predicted time in the predicted directions was lawfully stopped, a unanimous Court quite correctly relied upon the proposition that this result was supported by the fact that trained law enforcement officers are permitted to make 'inferences and deductions that might well elude an untrained person.' This is because in *Cortez* the inferences and deductions

---

[2] In this vein consider the following passage from *Hill*:
The point is, because the officers did not observe the scene for more than a few seconds *and they had no other reasons to reasonably suspect criminal activity*, such as a tip, they *lacked a reasonable basis to infer* much of anything about the girlfriend exiting the car and taking a few steps towards the apartment during the same time as their arrival.
752 F.3d at 1037 (emphasis added).

had been fully explained at the suppression hearing, and therefore . . . 'a particularized and objective basis' for the stop was established.

4 LaFave § 9.5(a) (citing *Cortez*, 449 U.S. 411) (footnotes omitted).[3]

On the facts of this case, we can see no objectively logical path of deduction that leads to reasonable suspicion of criminal activity at the time of Monsivais's seizure and detention. Unlike in *Cortez*, neither the Government nor the arresting officers have pointed to an objective fact that is contextually or inherently suggestive of criminal activity by Monsivais prior to the pat-down. And of course, where an articulable deductive relationship or connection between facts taken as premises does not form part of an officer's conclusion of criminal suspicion, then that conclusion cannot be objectively logical and can *only* be based on an impermissible intuitive sense or feeling—*i.e.*, a hunch.[4]

## III

---

[3] The dissent erroneously cites *United States v. Michelletti*, 13 F.3d 838 (5th Cir. 1994) (en banc), as supporting the seizure of Monsivais. It clearly does not. In *Michelletti*, which is clearly distinguishable, before the officer stopped and frisked the defendant, the officer saw him walk out of a bar at 2 o'clock in the morning after closing time with an open can of beer, thereby committing alcoholic beverage offenses under the Texas Alcoholic Beverage Commission regulations, *id.* at 841; and the officer observed that "Michelletti, a large and imposing man, was heading straight toward him with a 'cocky,' perhaps defiant attitude and his right hand concealed precisely where a weapon could be located," *id.* at 842. Thus, the officer in *Michelletti* pointed to specific and articulable facts warranting suspicion that Michelletti had committed, was committing, or was about to commit criminal acts before the officer stopped Michelletti and patted him down. In stark contrast, the officers here, prior to seizing Monsivais, pointed to no specific or articulable facts warranting suspicion of criminality by Monsivais, and in fact testified that they did not suspect him of any criminal act before Deputy Baker began the seizure of Monsivais by announcing that he was going to pat him down.

[4] *Compare Inference*, THE NEW SHORTER OXFORD ENGLISH DICTIONARY (4th ed. 1993) ("1 The action or process of inferring; *Logic* the drawing of a conclusion from data or premises; illation. . . . 2 A conclusion drawn from data or premises; an implication; the conclusion that is intended to be drawn.") *with Hunch*, *id.* ("5 An intuitive feeling. *Colloq.* (orig. *US*).") . *See also Deduce*, *id.* ("2 Infer, draw as a logical conclusion (*from* something already known or assumed); derive by a process of reasoning.").

The Government has failed to satisfy its burden under *Terry* of pointing to specific and articulable facts warranting reasonable suspicion that Monsivais had committed, was committing or was about to commit a criminal act prior to his seizure. Looking at the totality of the circumstances without sacrificing the rational inferences that *Terry* demands, we can see no objectively logical process that justifies interpreting the range of Monsivais's behavior as reasonably suspected criminal conduct. Therefore, the seizure violated his rights under the Fourth Amendment, and the evidence obtained therefrom must be suppressed. For these reasons, the district court's denial of the motion to suppress the evidence is REVERSED and Monsivais's conviction and sentence are VACATED.

JONES, Circuit Judge, dissenting:

The question the majority decide is whether officers formed a sufficient "reasonable suspicion" to attempt patting down a suspect walking away from an apparently broken down truck beside a major highway. Unusual facts imbue this police-suspect encounter, which should have warranted a narrow, fact-bound decision. Instead, my colleagues have chosen to engage in a broad analysis that departs from established Fifth Circuit authority and even from *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), the interpretive root of Fourth Amendment precedent. I dissent. This conviction should be upheld and, more importantly, the right of peace officers to act for their own safety on facts that would raise suspicion in the minds of any reasonable observer (including judges) should also be vindicated.

Consider first the facts. The patrol officers saw Monsivais walking eastbound on Interstate Highway 20 at dusk, in a rural area, and stopped to offer him assistance. Monsivais fluffed them off, walking directly by their car without saying a word. What kind of person, unless perhaps inebriated, mentally ill, or engaged in criminal behavior, would go around the patrol car to avoid the officers who are the only humans around and who could have helped him? When accosted, his answers to their polite questions made no sense. He couldn't tell them where he came from. He said he was headed to Ft. Worth, but his car was pointing in the opposite direction. He kept placing his hands in his pockets (where a weapon might be concealed) and had to be reminded multiple times to remove them. He acted extremely nervous and jittery, although the officers were in no way aggressive or threatening.

Who would not have regarded the totality of this bizarre behavior as suspicious? And why give no deference to Deputy Sheriff Baker, who frequently encountered people walking along the highway and never found

15

them nervous in talking with him? Officer Baker had conducted more than a hundred traffic stops, and Officer Saldana had over thirty years of law enforcement experience. The majority concede that Monsivais's behavior "might not have been typical of all stranded motorists." This is a clever but misleading judicial understatement. The officers were not harassing a guy on a city street. Law-abiding or sober people whose cars are stuck on the side of a highway, far out in the country, at dusk may fear to seek assistance from non-uniformed good Samaritans. But it is impossible to conceive that they'd flaunt their libertarian instincts to avoid contact with helpful law enforcement officers. The facts cry out reasonable suspicion.

Consider next the majority's application of long-settled law to the facts. The law is clear that a reviewing court examines the "totality of the circumstances," in light of the officers' training and experience, and should uphold the stop only if "the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002) (internal quotation omitted). Equally important, this court holds that the district court's denial of a motion to suppress must be upheld "if there is *any reasonable view* of the evidence to support it." *United States v. Michelletti,* 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (emphasis added). The majority's application of these standards is incomprehensible.

The majority ignore the officers' training and experience. The majority then deconstruct each item referenced in the officers' testimony, and finding each one "alone" insufficient to establish reasonable suspicion, stretch to the conclusion that, taken as a whole, they had no reasonable suspicion that Monsivais had violated or was about to violate the law. The majority conclude that "if the totality of the circumstances prior to the seizure of the defendant

does not provide a particularized and objective basis for suspecting the particular person seized of criminal activity, the seizure violates the Fourth Amendment." They add that, "[t]here must be some articulable premise—some fact linking that behavior to reasonably suspected criminality." They characterize the legal requirement as an "objectively logical path of deduction" that is "contextually or inherently suggestive of criminal activity."

What does the majority's reasoning mean? Exactly what additional facts were necessary to imply a "context or suggestion" of criminal activity by Monsivais? Did they have to see a bulge in his breast pocket, drug paraphernalia dangling from his pants, smudges of white powder on his clothes? The majority emphasize that the officers had no suspicion of exactly what crime Monsivais might have perpetrated or contemplated, but "reasonable suspicion" is a much lower standard than "probable cause." *Arvizu*, 534 U.S. at 274, 122 S. Ct. at 751. Even less does *Terry* demand "particularized suspicion of a particular, specific crime." *United States v. Pack,* 622 F.3d 383, 383 (5th Cir. 2010). In *Terry*, the officer patdown was approved by the Supreme Court simply on "reasonable suspicion" that the defendants, seen hanging around a jewelry shop, might be casing the establishment for a robbery. 392 U.S. at 28, 88 S. Ct. at 1883. The Supreme Court recently reiterated these bare facts and approvingly summarized the holding of *Terry*:

> *Terry* established the legitimacy of an investigative stop "in situations where [the police] may lack probable cause for an arrest." *Id.,* at 24, 88 S. Ct. 1868. When the stop is justified by suspicion (reasonably grounded, but short of probable cause) that criminal activity is afoot, the Court explained, the police officer must be positioned to act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous. *Ibid.* Recognizing that a limited search of outer clothing for weapons serves to protect both the officer and the public, the Court held the

17

patdown reasonable under the Fourth Amendment. *Id.* at 23–24, 27, 30–31, 88 S. Ct. 1868.

*Arizona v. Johnson,* 555 U.S. 323, 330, 129 S. Ct. 781, 786 (2009). In *Terry,* the Supreme Court relied heavily on the officers' seasoned judgment. 392 U.S. at 22–23, 88 S. Ct. at 1880–81. Yet under the majority's reasoning here, bereft of deference to the law enforcement officers, how could the *Terry* defendants' walking back and forth in front of the jewelry store constitute an "articulable premise" and a "fact linking [the defendants'] behavior to reasonably suspected criminal activity"?

This court long ago relied on *Terry* in an en banc decision that upheld an officer's patdown of a suspect who barged out the back door of a bar at closing time. *Michelletti,* 13 F.3d at 839. The officer's suspicions were aroused principally by the aggressiveness of the man's stride toward a group of men and by his holding a beer in the left hand while his right hand remained in his pants pocket. (A convicted felon, the man illegally possessed a handgun in that pocket.) The majority fail to mention, much less distinguish *Michelletti,* which has been frequently cited and remains controlling in this court. *See, e.g., Allen v. Cisneros*, 815 F.3d 239, 245 (5th Cir. 2016); *Estep v. Dallas Cty., Tex.*, 310 F.3d 353, 363–64 (5th Cir. 2002); *United States v. Baker*, 47 F.3d 691, 694 (5th Cir. 1995); *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010). Under the majority's reasoning, what additional facts would have been necessary to create an "objectively logical path of deduction" and uphold the patdown of Michelletti?

The majority cite only one case from this circuit to support suppression of the evidence incriminating Monsivais, and they stretch that case well beyond its facts. In *Hill,* this court concluded that officers incorrectly insisted

on doing a patdown on the basis of nothing more than "almost entirely ordinary" behavior by the defendant and a woman who'd been sitting in his car in apartment complex parking lot. *United States v. Hill*, 752 F.3d 1029, 1034 (5th Cir. 2014). This court's commonsense conclusion was that "[r]easonable officers in such circumstances would have very little cause to suspect criminal activity rather than, say, a couple who just arrived home on a weekend night and were preparing to go inside." 752 F.3d at 1058. In contrast to *Hill,* there is nothing "almost entirely ordinary" about Monsivais's conduct in his encounter with these officers. *Hill* is readily distinguishable.

It is relevant to the Fourth Amendment inquiry that the officers' seizure of Monsivais involved only the level of intrusion necessary to assure their safety. *Scroggins*, 599 F.3d at 441. That is to say, the handcuffing and actual frisk occurred only after he had voluntarily revealed a handgun in his waistband. (The record contains no suggestion that Monsivais tried to claim possession of a concealed handgun permit). Recall as well this defendant's repeatedly reaching into his pockets where weapons might also be concealed. Under such circumstances, officers conducting a *Terry* stop may pat down and even handcuff a subject to ensure their personal safety. *United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998); *see also United States v. Hurd*, 785 F.3d 311, 315 (8th Cir. 2015) (frisk justified where the person refused to remove hands from pockets when walking toward police).

The majority opinion, in my view, conflicts with *Terry* and this court's precedent and may create great confusion for officers on the beat. Over twenty years ago, this court noted in *Michelletti* that since *Terry* had been decided, "the number of police officers killed annually in the line of duty has tripled . . . [and] the numbers of those assaulted and wounded has risen by a factor of twenty." 13 F.3d at 844 (citation omitted). The dangers inherent in

law enforcement to officers and the public has, if anything, intensified in recent years. "Surely the constitutional legitimacy of a brief patdown such as occurred here may and should reflect the horrendously more violent society in which we live, [forty-nine] years after *Terry*." *Id.* I respectfully dissent.